# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GARY O. MARINO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11605-VCL |
| | ) | |
| PATRIOT RAIL COMPANY LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: December 9, 2015
Date Decided: February 29, 2016

Philip Trainer, Jr., Toni-Ann Platia, ASHBY & GEDDES, Wilmington, Delaware; Lawrence J. Hamilton II, Frederick D. Page, Ben Ziggy Williamson, HOLLAND & KNIGHT LLP, Jacksonville, Florida; *Counsel for Plaintiff Gary O. Marino.*

John D. Hendershot, Rachel E. Horn, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Charles Bachman, O'MELVENY & MYERS LLP, New York, New York; *Counsel for Defendant Patriot Rail Company LLC.*

**LASTER, Vice Chancellor.**

Plaintiff Gary O. Marino seeks advancements of fees and expenses from defendant Patriot Rail Company LLC (the "Company"). The parties have cross-moved for summary judgment. Marino's motion is granted. The Company's motion is denied.

## I.    FACTUAL BACKGROUND

The facts are drawn from the affidavits and supporting documents that the parties submitted in connection with their motions for summary judgment. The parties agreed in their briefs and at oral argument that there were no disputes of material fact that would affect the outcome. Pursuant to Court of Chancery Rule 56(h), the cross-motions therefore became "the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." Ct. Ch. R. 56(h).

### A.    Marino And The Company

From 2004 until June 18, 2012, Marino served as Chairman, President, and CEO of the Company. He indirectly owned 23.75% of its equity. Patriot Rail Holdings LLC ("Parent") owned all of the stock of the Company. Patriot Rail LLC ("Grandparent") owned all of the member interests of Parent. Patriot Equity LLC ("Great-Grandparent") owned 23.75% of the member interests of Grandparent and served as its managing member. Marino owned 100% of Great-Grandparent.

Marino previously owned another 25.5% of Grandparent, which he held either directly or through Great-Grandparent. At some point, he transferred those interests to the Marino Family Dynasty Trust for no consideration. Together, Marino and the Marino Family Dynasty Trust owned nearly 60% of the member interests in Grandparent (23.75% + 25.5% = 59.25%).

1

The Company operates short-line and regional freight railroads throughout North America. The Company remained a Delaware corporation until May 1, 2013, when it converted into an LLC. The conversion did not affect its liabilities or obligations. *See* 8 *Del. C.* § 266(e).

**B.      The Company's Involvement With Sierra**

Non-party Sierra Railroad Company provides railroad-related services. At various points, Marino discussed the possibility of the Company acquiring Sierra with Sierra's management team. As part of those discussions, the Company and Sierra entered into a non-disclosure agreement dated September 29, 2005.

Sierra had a contract with McClellan Business Park to provide rail switching services (the "Switching Contract"). It was scheduled to expire on February 29, 2008. In 2007, as part of the periodic discussions about a business combination, Sierra provided the Company with confidential information about the Switching Contract. At the time, Sierra was negotiating with McClellan to extend the Switching Contract. To reassure McClellan that Sierra had an industry partner that could back Sierra in fulfilling an extended agreement, Sierra took Marino and other Company employees to meet with McClellan representatives.

McClellan decided not to extend the Switching Contract and instead issued a request for proposals. Both Sierra and the Company submitted bids. In January 2008, McClellan awarded the contract to the Company.

## C. The First California Lawsuit

In March 2008, Sierra sued the Company in the United States District Court for the Eastern District of California (the "California Court"). Sierra's complaint included claims for breach of the non-disclosure agreement, misappropriation of trade secrets, and interference with prospective business relationships.

Later in March 2008, the Company and Sierra entered into a letter of intent for an asset purchase. Sierra dismissed its claims without prejudice the same day. But negotiations broke down, and the deal did not close.

## D. The Underlying Action

On December 31, 2008, the Company filed suit against Sierra in the California Court for breaching the letter of intent. Sierra filed counterclaims, including the claims it previously had dismissed without prejudice, plus a new claim that the Company had breached the letter of intent. This decision refers to the proceedings in the California Court as the "Underlying Action."

In February 2009, Sierra filed an amended pleading that sought to add Parent, Grandparent, and Great-Grandparent to the litigation. Sierra did not serve Parent or Great-Grandparent. The Company and Grandparent filed answers. Parent and Great-Grandparent did not appear.

## E. The Intervening Stock Sale And Fund Transfers

In 2012, while the Underlying Action was pending, Patriot Funding LLC (the "Buyer") purchased 100% of the Company's stock from Parent (the "Stock Sale"). The transaction was governed by a stock purchase agreement dated May 4, 2012 (the "Stock

Purchase Agreement" or "SPA"). The Stock Sale closed on June 18, 2012. Effective upon closing, Marino resigned from all of his positions with the Company.

Buyer paid Parent $230 million for the stock of the Company. Not surprisingly, the parties to the Stock Sale bargained over the Underlying Action and allocated the risk of an adverse outcome in the Stock Purchase Agreement. The Stock Purchase Agreement created a special indemnification procedure for claims related to the Underlying Action, secured by an escrow fund of $20 million. *See* SPA § 7.4(b); SPA Ex. D. The governing agreements called for up to $16 million to be released from the escrow fund to Parent one year after closing. *See* SPA Ex. D § 4(c). If the Underlying Action was not yet resolved at that point, the remaining $4 million would remain in escrow until its conclusion.

Over the course of three distributions, Parent transferred $112.6 million of net sale proceeds to the investors in Grandparent (collectively, the "Fund Transfers"). The first transfer occurred on the date the Stock Sale closed. The second happened on February 6, 2013. The third happened on August 1, 2013. According to Sierra, Marino and the Marino Dynasty Trust received approximately $48 million.

In the ordinary course, each distribution would have been made from Parent to Grandparent, then Grandparent would have distributed the funds to its investors. Sierra alleges Parent used different mechanisms to transfer funds to Marino, the Marino Dynasty Trust, and other investors in Grandparent because Grandparent was a defendant in the Underlying Action and Marino did not want the funds flowing through its accounts.

4

**F.    The Pre-Judgment Hearing**

In March 2013, Sierra moved for leave to serve Parent and Great-Grandparent with its claims and bring them into the case as parties. Sierra argued that it needed Parent and Great-Grandparent in the case to protect its ability to collect on a potential judgment.

In June 2013, the Company represented to the California Court that it would not take any steps to render itself judgment-proof. Relying on the Company's representations, the California Court denied Sierra's motion. The California Court observed that, if necessary, Sierra could "move post trial to substitute appropriate parties to effect judgment." Dkt. 28, Ex. at 9.

**G.    The California Judgment And The Post-Judgment Motion**

The Underlying Action proceeded to trial. On March 28, 2014, a jury awarded compensatory damages of $22.3 million in favor of Sierra and against the Company and Grandparent. On May 1, the jury awarded punitive damages of $16.2 million in favor of Sierra and against the Company, plus $1.2 million in favor of Sierra and against Grandparent. On October 23, the California Court awarded additional exemplary damages of $13.1 million in favor of Sierra and against the Company. The California Court did not award additional exemplary damages against Grandparent because it had "no ability to pay." *Id.* at 11. This decision refers to these awards collectively as the "California Judgment."

On July 6, 2015, Sierra moved to amend the California Judgment to add Marino, Parent, and Great-Grandparent as judgment debtors. On January 14, 2016, Sierra filed its amended motion (the "Post-Judgment Motion"). Sierra contended that the Post-Judgment

5

Motion was necessary because the Company and Grandparent had rendered themselves judgment proof. According to Sierra, during the bulk of the Underlying Action, the Company and Grandparent had a combined net worth that ranged from $118 million to $171 million. By the time of trial however, the Company and Grandparent had reduced their combined net worth to only $1.3 million.

To add Marino, Parent, and Great-Grandparent as judgment debtors, Sierra relied on Section 187 of the California Code of Civil Procedure:

> When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code.

Cal. Civ. Proc. Code § 187. California decisions have interpreted Section 187 to confer on a trial court the general equitable power to amend a judgment to add additional debtors who were alter egos of parties already liable under the judgment and who controlled the litigation that resulted in the judgment.[1]

---

[1] *See*, *e.g.*, *McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*, 107 Cal. Rptr. 2d 702, 706 (Cal. Ct. App. 2001) ("[A Section 187 motion] is an appropriate and complete method by which to bind new individual defendants where it can be demonstrated that in their capacity as alter ego of the corporation they in fact had control of the previous litigation, and thus were virtually represented in the lawsuit." (quotation marks omitted)); *NEC Elecs. Inc. v. Hurt*, 256 Cal. Rptr. 441, 444 (Cal. Ct. App. 1989) ("[I]f the claim of individual liability is made at some later stage in the action, the judgment can be made individually binding on a person associated with the corporation only if the individual to be charged, personally or through a representative, had control of the litigation and occasion to conduct it with a diligence corresponding to the risk of personal liability that was involved." (quotation marks omitted)); *accord Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1148 (9th Cir. 2004) ("A § 187

6

The California Court has not yet ruled on the Post-Judgment Motion. Consistent with cases applying Section 187, Sierra argues in the Post-Judgment Motion that Marino should be added as a judgment debtor because (i) he was involved in the conduct that gave rise to the California Judgment, (ii) he controlled the Company before the Stock Sale, (iii) he deprived the Company of assets that it could use to pay the California Judgment, and (iv) he directed the Company's defense in the Underlying Action.

## H.     This Litigation

By letter dated July 30, 2015, Marino's counsel asked the Company to advance the fees and expenses that Marino would incur to oppose the Post-Judgment Motion. Marino's counsel regarded the Post-Judgment Motion as a continuation of Sierra's claims in the Underlying Action, which meant that the Post-Judgment Motion related to actions that Marino had taken while an officer and director of the Company.

The Company saw things differently. By letter dated August 7, 2015, the Company took the position that the Post-Judgment Motion focused primarily on the Fund

---

amendment requires (1) that the new party be the alter ego of the old party *and* (2) that the new party had controlled the litigation, thereby having had the opportunity to litigate, in order to satisfy due process concerns." (quotation marks omitted)); *In re Levander*, 180 F.3d 1114, 1121 (9th Cir. 1999) ("To amend a judgment under § 187, two requirements must usually be met: (1) that the new party be the alter ego of the old party *and* (2) that the new party had controlled the litigation, thereby having had the opportunity to litigate, in order to satisfy due process concerns." (quotation marks omitted)); *see Mesler v. Bragg Mgmt. Co.*, 702 P.2d 601, 612 (Cal. 1985) (en banc) ("Plaintiffs often move postjudgment to amend a judgment in their favor to add a previously unnamed person or entity as a defendant on the ground that it or he is the alter ego of an originally denominated defendant. However, such amendment is not permitted in the absence of a showing of due diligence on the part of the plaintiff, and of participation in the defense of the underlying action by the claimed alter ego." (citations omitted)).

7

Transfers, which took place when Marino was no longer an officer or director of the Company.

By letter dated September 30, 2015, Marino's counsel made another demand for advancements, and Marino provided a signed undertaking to repay any advancements he received if he was not ultimately entitled to indemnification. The Company again denied his request.

On October 13, 2015, Marino commenced this action. He sought advancements of attorneys' fees and expenses for the claims asserted against him in the Post-Judgment Motion. He also sought fees on fees to the extent he was successful in this action. The Company answered, and the parties cross-moved for summary judgment.

## II.       LEGAL ANALYSIS

Article VIII of the Company's certificate of incorporation states: "This Corporation shall indemnify and shall advance expenses on behalf of its officers and directors to the fullest extent permitted by law in existence either now or hereafter." Through this provision, the Company bound itself to "advance expenses on behalf of" Marino in his capacity as one "of its officers and directors." Once the Stock Sale closed, however, Marino resigned from his positions with the Company and ceased to be an officer or director.

No one disputes that if Marino had been sued by reason of his status as an officer or director while he was serving as an officer or director, then the Company would have been obligated to provide advancements. The dispute is about whether Article VIII continues to cover Marino for the same types of claims now that he has ceased to be an

8

officer or director. Marino contends that he remains covered for claims challenging the propriety of actions he took while serving an officer and a director. The Company contends that his coverage terminated when he ceased to be an officer or a director.

Because the Company's charter contemplates advancement "to the fullest extent permitted by law," the answer turns on the language of the indemnification and advancement statute. 8 *Del. C.* § 145. Three subsections of Section 145 carry particular significance: (i) Section 145(e), which authorizes advancements, (ii) Section 145(j), which addresses the extent to which a covered person's indemnification and advancement rights for actions taken during the person's period of service continue after the person has ceased to serve, and (iii) Section 145(f), which limits a corporation's ability to cause a covered person's rights to terminate after the person has served in reliance upon them.

## A.    Section 145(e)

Section 145(e) of the Delaware General Corporation Law (the "DGCL") confers permissive authority on Delaware corporations to grant advancements.[2] It states:

> Expenses (including attorneys' fees) incurred by an officer or director of the corporation in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in

---

[2] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 212 (Del. 2005) ("The advancement authority conferred by section 145(e) is permissive."); *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 823 (Del. 1992) (same); *Sodano v. Am. Stock Exch. LLC*, 2008 WL 2738583, at *15 n.83 (Del. Ch. July 15, 2008) (Strine, V.C.) ("Section 145(e) allows a corporation to advance the costs of litigation to corporate officials. That allowance is permissive, not mandatory and therefore a corporation is free to limit the terms of advancement and even preclude advancement entirely." (quotation marks and citation omitted)), *aff'd sub nom. Am. Stock Exch. LLC v. Fin. Indus. Regulatory Auth., Inc.*, 970 A.2d 256 (Del. 2009) (TABLE).

9

advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents of the corporation or by persons serving at the request of the corporation as directors, officers, employees or agents of another corporation, partnership, joint venture, trust or other enterprise may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

8 *Del. C.* § 145(e).

Like other sections of Delaware law that confer specific powers on an entity,[3] Section 145(e) confirms that a Delaware corporation has the authority to grant advancements. These specific grants eliminate any doubt about whether a particular power falls within the generalized grant of authority provided by Section 121(a) of the DGCL, which confers on a Delaware corporation, its officers, directors, and stockholders "all the powers and privileges granted by this chapter or by any other law or by its certificate of incorporation, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business or purposes set forth in its certificate of incorporation." 8 *Del. C.* § 121(a).

---

[3] *See*, *e.g.*, *id.* § 122 (identifying seventeen specific grants of authority); *id.* § 123 (specifying a corporation's powers to deal in securities). *See generally Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 649-54 (Del. Ch. 2013) (discussing power-conferring sections of the DGCL as a means of addressing the *ultra vires* doctrine as it developed during the nineteenth and early twentieth centuries).

In framing the scope of the statutory authority for advancements, Section 145(e) distinguishes between "an officer or director of the corporation" and "former directors and officers or other employees and agents of the corporation or by persons serving at the request of the corporation as directors, officers, employees or agents of another [entity]." For "an officer or director of the corporation," Section 145(e) authorizes the corporation to provide advancements "upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section." For other persons, Section 145(e) authorizes the corporation to provide advancements "upon such terms and conditions, if any, as the corporation deems appropriate."

The Company makes much of this distinction, which it says demonstrates that the unqualified term "officers and directors" only means currently serving officers and directors. Based on this reading, the Company interprets its charter provision as granting advancement rights only to individuals who are currently serving as officers and directors at the time of the litigation. As the Company sees it, once those individuals ceased to be officers and directors, they became former officers and directors and no longer had indemnification or advancement rights. Marino understands the provision differently. He believes that he was covered while serving as an officer and director, and that he continues to have coverage for the time during which he served as an officer and director. His coverage may have terminated prospectively, because from that point on he was a former officer and director, but it did not disappear retrospectively for the period of time when he previously served.

11

Section 145 addresses this issue, but the answer is not found in Section 145(e). Two other subsections speak to whether existing indemnification and advancement rights continue after an individual has ceased to serve. Section 145(j) addresses the continuation question directly and provides that the rights continue unless the governing provision stated expressly that they would terminate. *See* Part II.B, *infra*. Section 145(f) addresses the related issue of whether a corporation can cause a director or officer's coverage to terminate, after the individual has served in reliance on it, by amending or altering the governing provisions. *See* Part II.C, *infra*.

History teaches that Section 145(e) singles out current officers and directors in its first sentence for a different reason. During the 1967 revision to the DGCL, which birthed Section 145(e) substantially in its modern form,[4] the drafting committee wanted to signal that current officers and directors could receive advancements conditioned only on an unsecured undertaking, and that a decision to grant advancements on that basis should not be subject to challenge. At the time, prominent voices argued that statutory grants of specific authority should displace equitable review,[5] and the same drafters introduced

---

[4] Ernest L. Folk, III, The Delaware General Corporation Law: A Commentary and Analysis 98 (1972) (explaining that "Section 145 is a completely redrafted and greatly expanded provision . . . and bears almost no resemblance to the prior provision"). During the three years preceding the wholesale revisions to the DGCL in 1967, "no subject was more discussed among members of the corporate bar than the subject of indemnification of officers and directors." S. Samuel Arsht & Walter K. Stapleton, *Delaware's New General Corporation Law: Substantive Changes*, 23 Bus. Law. 75, 77-78 (1967).

[5] *See generally* Jack B. Jacobs, *The Uneasy Truce Between Law and Equity in Modern Business Enterprise Jurisprudence*, 8 Del. L. Rev. 1, 4-9 (2005) (tracing history of period); Leo E. Strine, Jr., *If Corporate Action Is Lawful, Presumably There Are*

12

specific statutory standards for approving related-party transactions. *See* 8 *Del. C.* § 144. Viewed in context, these grants of authority suggest a desire to supplant fiduciary review, as litigators subsequently argued.[6]

It made particular sense for the drafters to strive for a statutory safe harbor for advancements to current officers and directors, because a Court of Chancery decision from 1962 had questioned how current directors could advance themselves funds "before final disposition of [the] action." *Essential Enters. Corp. v. Dorsey Corp.*, 182 A.2d 647, 653 (Del. Ch. 1962) (Seitz, C.). Professor Ernest L. Folk, III, who was the reporter for the 1967 revision, explained that Section 145(e) responded in significant part to *Essential Enterprises*. *See* Folk, *supra*, at 101. A grant of advancements to current officers and directors also would fall within the literal language of Section 144, which encompassed

---

*Circumstances in Which It Is Equitable to Take That Action: The Implicit Corollary to the Rule of* Schnell v. Chris-Craft, 60 Bus. Law. 877, 881-83 (2005) (same).

[6] *See Havens v. Attar*, 1997 WL 55957, at \*14 (Del. Ch. Jan. 30, 1997) (describing the defendants' argument that "the absence of specific procedural restrictions in Section 145(e) expresses an intent of our Legislature to exempt directors from liability for breaches of the duty of loyalty when making a decision to advance expenses," but rejecting that position and treating the grant of advancements as an interested transaction to which entire fairness applied); E. Norman Veasey, Jesse A. Finkelstein & C. Stephen Bigler, *Delaware Supports Directors with a Three-Legged Stool of Limited Liability, Indemnification, and Insurance*, 42 Bus. Law. 399, 411 (1987) (describing Section 145(e) as "a legislative statement that a transaction advancing litigation expenses is fair to the corporation if the statute is followed"); *cf.* C. Stephen Bigler & Blake Rohrbacher, *Form or Substance? The Past, Present, and Future of the Doctrine of Independent Legal Significance*, 63 Bus. Law. 1, 1-15 (2007) (reviewing history of Section 144 and arguments about its scope).

any "contract or transaction between a corporation and 1 or more of its directors or officers."[7]

The drafters of the 1967 revision sought to eliminate uncertainty by having the first sentence of Section 145(e) specifically authorize a corporation to provide advancements to then-serving directors and officers conditioned solely on an unsecured undertaking. The sentence arguably represented a legislative determination that advancing litigation expenses to current officers or directors on that basis was entirely fair.[8]

By contrast, there was no need for similar concern about granting advancements to former officers and directors or to other persons. Granting advancements to them was not an interested transaction. Absent additional facts that would implicate a higher standard

---

[7] 8 *Del. C.* § 144(a); Lewis S. Black, Jr. & A. Gilchrist Sparks, III, *Analysis of the 1983 Amendments to the Delaware Corporation Law*, 2 Prentice-Hall Corp. Rep. 311, 313 (1983) ("[I]n the case of a suit against directors and/or officers, the decisions to advance expenses is often in essence an interested transaction."); *cf.* Donald E. Pease, *Outside Directors: Their Importance to the Corporation and Protection from Liability*, 12 Del. J. Corp. L. 25, 78 (1987) ("A remaining issue is whether the interest of the directors in the advance transaction invokes the provisions of section 144 . . . .").

[8] *See* E. Norman Veasey, *Directors and Officers*, *in* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law Of Corporations & Business Organizations* 192-93 (1980), *quoted in* Pease, *supra*, at 78 ("Section 144(a)(3) of the General Corporation Law removes the disqualification of interested directors if the transaction 'is fair to the corporation as of the time it is authorized, approved or ratified by the board of directors . . . .' Section 145(e) is a legislative statement that a transaction advancing litigation expenses under the circumstances is fair to the corporation if the corporation receives an undertaking to repay."); *see Havens*, 1997 WL 55957, at *14 (observing that the defendants argued that "the absence of specific procedural restrictions in Section 145(e) expresses an intent of our Legislature to exempt directors from liability for breaches of the duty of loyalty when making a decision to advance expenses").

of review, the decision to provide advancements would be protected by the business judgment rule. The second sentence of Section 145(e) therefore provided that a corporation could provide advancements to those individuals on terms the corporation "deems appropriate," *i.e.*, in the board's business judgment.

The problem that the drafters sought to solve explains the superficially counterintuitive structure of Section 145(e). Read literally, the statute requires more before a corporation can provide advancements to "an officer or director of the corporation" (because the first sentence requires an undertaking) than it does for "former directors and officers" (where the statute permits the corporation to provide advancements on whatever terms it "deems appropriate"). The drafters took this approach because they were trying to establish a legitimizing norm for granting advancements to current directors and officers, so they needed to say where the floor was. Advancements to others did not raise conflict issues, so the drafters could leave the decision entirely to the board of directors.

As Delaware law has developed, the courts have largely harmonized the two sections. Decisions have recognized that a corporation can require more than just an undertaking before providing advancements to "an officer or director,"[9] and a ruling by

---

[9] *See*, *e.g.*, *Thompson v. The Williams Cos., Inc.*, 2007 WL 3326007, at *2 (Del. Ch. July 31, 2007) (Strine, V.C.) (approving board's decision to require a fully-secured undertaking as a condition to advancement); *see also Blankenship v. Alpha Appalachia Hldgs., Inc.*, 2015 WL 3408255, at *5 (Del. Ch. May 28, 2015) (affirming advancement provision in merger agreement that conditioned advancement on "three enumerated 'factual representations and undertakings'").

this court rejected the proposition that a discretionary grant of advancements to currently serving directors was not subject to fiduciary review, *see Havens*, 1997 WL 55957, at *14. Decisions similarly have recognized that although the second sentence of Section 145(e) technically does not mention an undertaking, the receipt of advancements carries with it an implicit obligation to repay them if the recipient ultimately is not entitled to indemnification.[10] Any substantive distinction between the two regimes has effectively disappeared.

Post-1967 decisions by the Delaware Supreme Court also rendered untenable the strong-form contention that a statutory grant of authority necessarily foreclosed fiduciary review. Perhaps most famously, the Delaware Supreme Court explained in 1971 that "inequitable action does not become permissible simply because it is legally possible." *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971). In an arguably more significant albeit less heralded decision, the Delaware Supreme Court held in 1979 that Section 144 only addressed the statutory validity of an interested transaction; it did not foreclose fiduciary review.[11] By the takeover wars of the 1980s, it was established doctrine that a challenged defensive measure first had to pass statutory muster, then

---

[10] *See*, *e.g.*, *In re Genelux Corp.*, 2015 WL 6390232, at *5 (Del. Ch. Oct. 22, 2015); *Mooney v. Echo Therapeutics, Inc.*, 2015 WL 3413272, at *1 n.6 (Del. Ch. May 28, 2015).

[11] *Michaelson v. Duncan*, 407 A.2d 211, 218-19 (Del. 1979). *See generally* Blake Rohrbacher, John Mark Zeberkiewicz & Thomas A. Uebler, *Finding Safe Harbor: Clarifying the Limited Application of Section 144*, 33 Del. J. Corp. L. 719 (2008) (tracing history of Section 144 and equitable review of statutory compliant actions).

survive equitable scrutiny.[12] Recent Delaware cases have cited Adolf Berle's pithy axiom that corporate action is always "twice tested."[13]

Despite these subsequent judicial developments, the separate sentences in Section 145(e) remain. Given the historical context surrounding Section 145(e), I do not believe they were intended to do anything more than underscore the ability of current directors and officers to receive advancements after providing an unsecured undertaking. To my

---

[12] *See, e.g., Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1378 (Del. 1995); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 176 (Del. 1986); *Moran v. Household Prods.*, 500 A.2d 1346, 1356 (Del. 1985); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985).

[13] *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007) (Strine, V.C.) ("Corporate acts thus must be 'twice-tested'—once by the law and again by equity."); *accord Quadrant Structured Prods. Co., Ltd. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014) ("Delaware law adheres to the twice-testing principle."); *Carsanaro v. Bloodhound Techs., Inc.,* 65 A.3d 618, 641 (Del. Ch. 2013) ("Corporate acts are 'twice-tested,' once for statutory compliance and again in equity."); *see In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 434 (Del. Ch. 2002) (Strine, V.C.) ("Nothing about [the doctrine of independent legal significance] alters the fundamental rule that inequitable actions in technical conformity with statutory law can be restrained by equity.").

This does not mean that statutory structure is irrelevant to fiduciary review. "To the contrary, the structure and statutory rubric . . . are highly influential to courts shaping the common law of corporations." *Pure Res.*, 808 A.2d at 434.

> There are good reasons why this is so. A statute's own terms might foreclose (explicitly or implicitly) the application of traditional concepts of fiduciary duty, thereby requiring judges to subordinate default principles of the common law to the superior mandate of legislation. The relevant statutory technique might also be one that does not foreclose common law equitable review altogether, but that has certain characteristics that influence the judiciary's formulation of the extent and nature of the duties owed by the fiduciaries involved in the transaction

*Id.* (citations omitted). In this semi-strong version, the statute is not automatically pre-emptive but rather serves as an input that informs the scope of fiduciary review.

17

mind, the separate sentences do not suggest anything about whether individuals who possess indemnification and advancement rights as directors or officers lose them when they cease to serve. Section 145(j) is the statutory section that answers that question directly, and to which this decision now turns.

**B.      Section 145(j)**

Section 145(j) addresses what happens when an individual who is protected by indemnification or advancement rights while serving in a covered capacity ceases to serve in that capacity. It states:

> The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

8 *Del. C.* § 145(j) (the "Continuation Clause"). Unlike Section 145(e), which is a permissive grant of authority that a corporation can make mandatory, the Continuation Clause is a mandatory provision that requires an explicit opt-out ("unless otherwise provided when authorized or ratified").

The Continuation Clause establishes a default rule that indemnification and advancement rights "shall . . . continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person." Moreover, the provision contemplates not only continuation for a living individual who has "ceased to be a director, officer, employee, or agent," but also continuation for the benefit of the heirs, executors, and administrators of an individual who has, in all senses, "ceased to be." Far from implying that the rights

18

to indemnification and advancement that protect a current director or officer cease when the individual leaves office and becomes a former director and officer, the Continuation Clause says exactly the opposite: Unless the right specifically stated otherwise when the coverage was authorized or ratified, the protection continues.

Section 145(j) was not part of the 1967 revisions to the DGCL. The General Assembly added this section in 1986 in the post-*Van Gorkom* statutory package that included charter-based exculpation under Section 102(b)(7).[14] "The amendments were prompted by a growing awareness by members of the Corporation Law Section of the Delaware Bar Association that directors' concerns about personal liability were causing

---

[14] *See* 65 Del. Laws ch. 289 (1986) (authorizing charter-based exculpation subject to enumerated exceptions and amendments to Section 145). The previous year, in *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985), the Delaware Supreme Court held directors personally liable for breaching their fiduciary duties by selling their corporation for cash in a single-bidder process that the court deemed inadequate. Many commentators described the decision as contributing to a crisis in the directors' and officers' insurance market. *See*, *e.g.*, John C. Coffee, Jr., *Shareholders Versus Managers: The Strain in the Corporate Web*, 85 Mich. L. Rev. 1, 18 n.46 (1986) ("Possibly [due to *Van Gorkom* and the fallout from the failure in 1984 of the Continental Illinois National Bank and Trust Company], directors' and officers' liability insurance has become increasingly hard to obtain, and recent newspaper reports suggest that directors have become extremely anxious about their exposed position."); Bayless Manning, *Reflections and Practical Tips on Life in the Boardroom After* Van Gorkom, 41 Bus. Law. 1, 6 (1985) ("Premium rates for directors' and officers' insurance have soared within the past six months, and the availability of directors' and officers' insurance has been curtailed as insurers have dropped out of the field and policies have been cancelled. The *Van Gorkom* decision will aggravate that trend."). Delaware responded with a package of legislation that offered "the best practical solution, within the existing jurisprudential and legislative framework, to what has been characterized as the 'D & O Crisis' and its attendant problem of director resignation." Veasey et al., *supra*, at 401.

Delaware corporations to lose, or to be unable to attract, qualified men and women to serve on their boards." Black & Sparks, *supra*, at 311.

Before the 1986 amendments, Section 145(f) included a statement to the effect that indemnification rights "shall . . . continue as to a person who has ceased to be a director, officer, employee or agent." But Section 145(f) more prominently addressed the degree to which indemnification rights under or granted pursuant to the statue were non-exclusive, which had been a matter of considerable interest from 1967 onward.[15] The continuation language had not received similar attention. The 1986 amendments removed the continuation concept from the non-exclusivity provision's shadow and gave it a statutory home of its own in Section 145(j).

The plain and mandatory language of Section 145(j) now states that when a person has served in a covered capacity and made decisions or taken actions that implicate indemnification or advancement rights, then the coverage that person received in that capacity "shall . . . continue" unless the original grant of rights "otherwise provided." This means that if a person serves as a director and makes a decision, and if that person would be entitled to receive advancements in litigation over that decision while serving

---

[15] *See* Folk, *supra*, at 101-03 (discussing non-exclusivity clause); Veasey et al., *supra*, at 413-17 (same); *see also Waltuch v. Conticommodity Servs., Inc.*, 88 F.3d 87, 89-95 (2d Cir. 1996) (ruling on scope of non-exclusivity clause); Joseph W. Bishop, Jr., *Sitting Ducks and Decoy Ducks: New Trends in the Indemnification of Corporate Directors and Officers*, 77 Yale L.J. 1078, 1085 (1968) (reviewing legislative history of non-exclusivity clause); David M. Mace, *Directors and Officers Liability Insurance*, 85 Banking L.J. 39, 42-44 (1968) (analyzing Delaware's non-exclusivity clause and comparing it to similar provisions from other states).

as a director, then that person's rights to advancements "shall . . . continue" after that person "has ceased to be a director." Put differently, if the person is sued over the decision after that person "has ceased to be a director," the person is still entitled to advancements because the rights that the person had when serving "shall continue."

Under the Continuation Clause, the only way that a covered person loses coverage after having "ceased to be a director" is if the source of the coverage "otherwise provided when authorized or ratified." For example, an advancement right would terminate upon cessation of service if it said during the time when the director took the challenged action that "a director shall receive mandatory advancements while serving as a director, but will no longer receive mandatory advancements after having ceased to be a director."

By making clear that the operative scope of coverage is what existed "when authorized or ratified," Section 145(f) focuses on the protection in effect during the covered person's period of service, In this fashion, the Continuation Clause operates in harmony with other subsections of Section 145 that turn on the individual's capacity during the underlying events that led to the litigation, rather than the individual's capacity at the time suit is ultimately filed.

Section 145(a) is illustrative. In authorizing indemnification for third party actions, it states:

> A corporation shall have power to indemnify *any person who* was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, . . . *by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another [entity]* against expenses . . . actually and reasonably incurred by the person in connection with such action, suit or

21

> proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful.

8 *Del. C.* § 145(a) (emphasis added). In this provision, the phrase "is or was" does not create a distinction based on the individual's capacity at the time of suit. Precisely the contrary, the phrase eliminates that issue by authorizing indemnification in either case ("is or was") and shifting the focus to the individual's capacity at the time of the events giving rise to the suit. For purposes of statutory authority, capacity at the time of suit is irrelevant. The statute instead turns on whether the individual became involved in the litigation "by reason of" the individual's service in a covered capacity. Consistent with the Continuation Clause, Section 145(a) grants authority to a corporation to indemnify a person who "is or was" a director for actions that they took while a director. The "was" compliments the default rule of the Continuation Clause, which states that unless the indemnification or advancement right specifies otherwise, coverage for actions taken while in a covered capacity continues after the person "has ceased" to serve in the covered capacity.

Parallel usages of "is or was" appear in Section 145(b), which authorizes indemnification for actions by or in the right of the corporation. *Id.* § 145(b). To the same effect, other parts of Section 145 prominently encompass "present or former" directors, officers, employees, or agents.[16] In each case, the point of using these terms is not to

---

[16] *See id.* § 145(c) ("To the extent that *a present or former director or officer* of a corporation has been successful on the merits or otherwise in defense of any action, suit

22

protect persons for actions that they take after they have ceased to serve, *i.e.,* for things they do after becoming "formers." The point is rather to recognize the existence of continuing protection for those persons to the extent they took action while they were serving in covered capacities, *i.e.*, before they became "formers."

## C.    Section 145(f)

The third informative subsection is Section 145(f), which addresses whether a corporation can alter or eliminate the indemnification or advancement coverage that the corporation provided to an individual while serving in a covered capacity after that individual has served in reliance upon it. This scenario involves a more extreme variant of the continuation issue. Instead of addressing whether a covered person's rights presumptively continue, Section 145(f) answers the more serious question of whether a corporation can cause those rights not to continue by altering or eliminating them.

---

or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith." (emphasis added)); *id.* § 145(d) ("Any indemnification under subsections (a) and (b) of this section (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of *the present or former director, officer, employee or agent* is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of this section." (emphasis added)); *id.* § 145(h) ("For purposes of this section, references to 'the corporation' shall include, in addition to the resulting corporation, any constituent corporation . . . so that *any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation* as a director, officer, employee or agent of another [entity] shall stand in the same position under this section with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued." (emphasis added)).

In its present incarnation, the relevant part of Section 145(f) states:

> A right to indemnification or to advancement of expenses arising under a provision of the certificate of incorporation or a bylaw shall not be eliminated or impaired by an amendment to the certificate of incorporation or the bylaws after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought, unless the provision in effect at the time of such act or omission explicitly authorizes such elimination or impairment after such action or omission has occurred.

*Id.* § 145(f) (the "No Termination Clause"). The General Assembly added this language to Section 145(f) in 2009, prompted by a decision which held that a covered person's advancement rights did not vest through service and did not presumptively continue to provide coverage for actions taken during the period of service after the director became a "former," thereby enabling a corporation to eliminate a director's coverage for past service. *See Schoon v. Troy Corp.*, 948 A.2d 1157, 1168 (Del. Ch. 2008), *superseded by statute*, 77 Del. Laws Ch. 14, § 3 (2009).

The *Schoon* case involved a claim for advancements by William J. Bohnen, who had served as a director of Troy Corporation until he resigned in February 2005. During his time as a director, the relevant provision of Troy's bylaws stated: "[T]he Corporation shall pay the expenses incurred by any present or former director." *Id.* at 1165. Another section of Troy's bylaws tracked the Continuation Clause and provided as follows:

> The rights conferred by this Article shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of such person and the heirs, executors, administrators and other comparable legal representatives of such person.

*Id.* at 1166.

24

After Bohnen resigned, the Troy board of directors amended the bylaws to remove the word "former." The board accomplished this by striking the phrase "the Corporation shall pay the expenses incurred by any present or former director" and replacing it with the following language: "Losses reasonably incurred by a director or officer in defending any threatened or pending Proceeding . . . shall be paid by the Corporation in advance of the final disposition." *Id.* at 1169. The Troy board of directors did not amend the continuation provision.

Troy subsequently filed a plenary action against Bohnen in which Troy alleged that Bohnen had breached his fiduciary duties while serving as a director. Bohnen demanded that Troy advance his legal fees. Troy refused, arguing that Bohnen was now a former director and that its bylaws no longer provided advancements to former directors.

In the ensuing litigation over Bohnen's advancement rights, the trial court held that Bohnen did not have a right to advancements. The decision interpreted the amended bylaw as limiting advancements to directors and officers who were serving in office at the time suit was filed. Because the amendment eliminated a right Bohnen previously had enjoyed, the court considered whether Bohnen's rights had vested at the time of the amendment. The court held that a director's advancement rights did not vest until suit was filed, and thus a board could change a director's rights at any time before that point. The court read the continuation provision of the bylaws and the Continuation Clause in Section 145 as only contemplating continuation of advancement and indemnification rights after a lawsuit was filed. Under this reading, Bohnen's right to advancement right

had not yet vested at the time of the amendment, so the board could eliminate it without Bohnen's consent.

The *Schoon* case settled before the Delaware Supreme Court could hear the appeal, but the trial court decision was "promptly overturned by the Delaware General Assembly." Andrew M. Johnston, Amy L. Simmerman & Jeffrey M. Gorris, *Recent Delaware Law Developments in Advancement and Indemnification: An Analytical Guide*, 6 N.Y.U. J. L. & Bus. 81, 113 (2009). The synopsis to the amendment stated that the No Termination Clause "adopt[ed] a default rule different than the approach articulated in [*Schoon*]." Del. H.B. 19, 145th Gen. Assem. syn. § 3 (2009).

In that vein, the No Termination Clause started from a different premise than the *Schoon* decision. The decision posited that a covered person's rights did not vest until the filing of litigation and hence could be altered or eliminated at any point before then. The No Termination Clause chose a different point in time for vesting by providing that indemnification and advancement rights "shall not be eliminated or impaired by an amendment to the certificate of incorporation or the bylaws after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought." The statutory language recognizes that a covered person serves in a covered capacity in reliance on the indemnification and advancement rights that the corporation has provided, establishing a contractual relationship. As a matter of black letter contract law, the covered person's service provides the consideration necessary to form a binding contract. *See* Restatement (Second) of Contracts § 53 (1981). Because the individual's rights vest

26

at that point, they cannot be amended retroactively unless the original grant of protection specifically contemplated the possibility of after-the-fact amendment.

The No Termination Clause also started from a different premise than the *Schoon* decision on another key issue. The *Schoon* decision analyzed advancement and indemnification rights based on the individual's capacity at the time of suit, which enabled the court to conclude that the rights had been terminated. By specifying that the rights are fixed at "the act or omission that is the subject of the civil, criminal, administrative or investigative action," the No Termination Clause confirms that coverage turns on the individual's capacity at the time of service, consistent with other subsections in Section 145. *See* Part II.B, *supra*.

To illustrate the changes worked by Section 145(j), an analogy to insurance law may be helpful. Under the rejected *Schoon* approach, indemnification and advancement rights would have operated in a manner analogous to claims-made coverage. Under the post-amendment approach, indemnification and advancement rights operate like occurrence-based insurance coverage.[17] Under the occurrence-based system, protection

---

[17] *See* 43 Am. Jur. 2d *Insurance* § 681 ("The basic distinction between 'claims made' and 'occurrence policies' is that while the occurrence policy is triggered by the insured's liability-producing conduct, the claims made policy is triggered by the presentation of a claim."). *Compare* 45 C.J.S. *Insurance* § 640 ("An occurrence type of liability policy protects the policyholder from damages resulting from acts occurring during the period in which the policy is in effect. The nature of an occurrence policy is to provide coverage for all occurrences that take place during the policy period, regardless of when the claim is presented." (footnotes omitted)), *with id.* § 642 ("A 'discovery' or 'claims made' policy is one in which indemnity is provided no matter when the alleged error or omission or act of negligence occurred, provided the misdeed complained of is

27

for the covered period persists, even though time has marched on and the individual has ceased to serve by the time the lawsuit is eventually filed. Consequently, "[a] director who has retired or resigned normally has continuing protection." 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 4.12[F], at 4-89 (Supp. 2013).

## D.    Delaware Public Policy

Section 145(e), the Continuation Clause, and the No Termination Clause thus establish a framework in which (i) a corporation can grant mandatory advancement rights to directors and officers that provide coverage conditioned solely on an undertaking (Section 145(e)), (ii) those rights presumptively continue to provide coverage for actions the individuals took during their period of service even after the individuals have ceased to serve (Section 145(j)), and (iii) those rights presumptively cannot be altered or eliminated after they have exposed themselves to potential suit by serving on the corporation's behalf (Section 145(f)). This structure implements the public policy foundation for advancement and indemnification rights, which is to "encourage capable men [and women] to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve."[18]

---

discovered and the claim for indemnity is made against the insurance company during the policy period.").

[18] *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002) (quotation marks omitted); *accord Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005)

The public policy foundation for advancement and indemnification rights has particular salience when lawsuits target former directors and officers for actions taken during their periods of service. As Chief Justice Strine explained while serving as a Vice Chancellor,

> Corporate advancement practice has an admittedly maddening aspect. At the time that an advancement dispute ripens, it is often the case that the corporate board has drawn harsh conclusions about the integrity and fidelity of the corporate official seeking advancement. The board may well have a firm basis to believe that the official intentionally injured the corporation. It therefore is reluctant to advance funds for his defense, fearing that the funds will never be paid back and resisting the idea of seeing further depletion of corporate resources at the instance of someone perceived to be a faithless fiduciary.

> But, to give effect to this natural human reaction as public policy would be unwise. Imagine what EDS believes to be unthinkable: that the United States government and EDS are in fact wrong about Reddy. What if he in fact did not falsify records? What if he in fact did not do anything that was even grossly negligent? In that circumstance, it would be difficult to conceive of an argument that would properly leave him holding the bag for all of his legal fees and expenses resulting from two cases centering on his conduct as an employee of EDS. That result would make the promise made to Reddy in the EDS bylaws an illusory one.

---

("Advancement is an especially important corollary to indemnification as an inducement for attracting capable individuals into corporate service."); *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 84 (Del. 1998) (explaining that advancement rights "encourag[e] capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity"); Folk, *supra*, at 98 ("The invariant policy of Delaware legislation on indemnification is to promote the desirable end that corporate officials will resist what they consider unjustified suits and claims, secure in the knowledge that their reasonable expenses will be borne by the corporation that they have served if they are vindicated." (quotation marks omitted)).

*Reddy v. Elec. Data Sys. Corp.*, 2002 WL 1358761, at *5-6 (Del. Ch. June 18, 2002) (footnote omitted).

As human beings, the directors serving when a lawsuit is filed have a natural inclination to deny advancement to former directors and officers if they perceive those individuals as having harmed the corporation. Mandatory indemnification and advancement rights address this concern, but if those rights presumptively ceased when an individual stopped serving as a director or officer (*contra* the Continuation Clause), then former directors and officers again would face significant risk. If a corporation could alter or terminate a director or officer's indemnification or advancement rights after service but before litigation was filed (*contra* the No Termination Clause), then the exposure would be greater. By establishing a statutory presumption of continuing coverage for actions taken during the period of service, the Continuation Clause and the No Termination Clause ensure that the public policy interest prevails, unless the individuals know when they choose to serve that their rights will terminate or can be cut off later.

### E. The Upshot For Marino

Under the statutory framework as I understand it, the Company's charter conferred indemnification and advancement rights on Marino that work as follows. When Marino agreed to serve in a covered capacity, he became entitled to receive mandatory indemnification and advancements to the fullest extent of Delaware law. That coverage was part of the consideration that the Company offered in exchange for his service.

Through service, his coverage vested.[19] The Company's charter provision did not state up front that it could be amended retroactively or that Marino would lose coverage when he

---

[19] *See Jennings v. San Vicente Gp, Inc.*, C.A. No. 19348, at 10 (Del. Ch. Mar. 27, 2002) (TRANSCRIPT) ("[T]he right to seek advancement . . . came into existence . . . when the plaintiffs became directors . . . . At that point, the right was inchoate but, by its very nature, became exercisable when an indemnifiable event occurred."); *Salaman v. Nat'l Media Corp.*, 1992 WL 808095, at *6 (Del. Super. Oct. 8, 1992) (explaining that a director's rights to advancement and indemnification under the bylaws "vested" through the director's service at the time of the events giving rise to the underlying lawsuit and that the underlying lawsuit "triggered" the corporation's obligations under the bylaws).

Commentators who have discussed the operation of indemnification and advancement rights after the General Assembly's response to *Schoon* have described the point of vesting as combining both service and an event that later leads to litigation. *See* 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 16.04, at 16-23 (Supp. 2012) ("[U]nder the current default rule, the right to advancement vests at the time of the act or omission giving rise to such right."); Mark A. Sargent & Dennis R. Honabach, *D&O Liability Handbook* § DE:2 (2015) ("[The amendment to Section 145(f)] effectively provides that a director or officers [sic] right to indemnification or advancement under a corporate bylaw vests at the occurrence of the act or omission that is the subject of the . . . action, suit or proceeding unless the bylaw expressly provides otherwise. . . . Most commentators believe the court erred in *Schoon* and predict that should another bylaw amendment case arise, the courts would effectively apply the new provision retroactively."); 1 Welch et al., *Folk on the Delaware General Corporation Law* § 145.08, at 4-421-22 n.116 (6th ed. 2015) ("The 2009 amendment effectively overruled the default position of some earlier cases holding that a director's right to advancement does not vest when the director takes office, and that rights could be eliminated where there was no evidence that the corporation was contemplating claims against the director at the time of the amendment.").

Because indemnification and advancement rights are triggered by actions, suits, and proceedings, there necessarily will be an event that gives rise later to litigation. Whether a particular act or omission will give rise to litigation often cannot not be known at the time of the act. It seems more straightforward to me, therefore, to speak of vesting through service. The statutory reference to the act or omission is nevertheless helpful in emphasizing that the scope of the operative right is determined at that point. It also makes clear that rights can be changed for prospective periods of service, but not for past periods of service, unless the right that previously governed that past period of service "otherwise provided when authorized or ratified."

31

ceased to serve.[20] The Company therefore could not amend the coverage retroactively (Section 145(f)), and the coverage continues to protect Marino even though he has ceased to serve (Section 145(j)).

Marino's continuing coverage is retrospective, not prospective. The coverage only covers Marino for his period of service as an officer and director and protects him against lawsuits brought "by reason of" his service.[21] Marino is not covered for actions taken

---

[20] *See Jennings*, C.A. No. 19348, at 11 ("The right that had vested in these plaintiffs was a contract right that, as in the *Salaman* case, cannot be taken away once it became vested."); *Salaman*, 1992 WL 808095, at *6 (explaining that a director's "right to advancement and indemnification is a vested contract right which cannot be unilaterally terminated"); *see also In re Genelux Corp.*, 2015 WL 6390232, at *4 (Del. Ch. Oct. 22, 2015) ("[I]t would be inequitable to deny [a former director] his claimed right to advancement . . . . To hold otherwise would allow the Company to allege misconduct of a director in his capacity as a fiduciary and to attempt to invalidate his personal property rights and related corporate rights without naming him a defendant, thereby forcing him either to intervene in the action at his own expense or risk losing important rights."); *Kidsco Inc. v. Dinsmore*, 674 A.2d 483, 492 n.6 (Del. Ch. 1995) (stating that "no 'contractual' right to maintain an existing by-law has ever been recognized, except in the compelling (and quite different) context of a director's individual indemnification rights that became perfected before the board amended its by-laws"), *aff'd*, 670 A.2d 1338 (Del. 1995); *see also Bergonzi v. Rite Aid Corp.*, 2003 WL 22407303, at *3 (Del. Ch. Oct. 20, 2003) (holding that corporation could not "unilaterally rescind" its charter provision that barred the corporation from asserting a "conduct" defense in advancement action and explaining that the corporation "must now maintain its bargain with its former officer").

[21] *See Homestore, Inc. v. Tafeen*, 888 A.2d 204, 213-14 (Del. 2005) (granting advancements to former officer where officer was named as a defendant in lawsuits "by reason of" actions he allegedly took during his period of service); *Stockman v. Heartland Indus. P'rs, L.P.*, 2009 WL 2096213, at *5-9 (Del. Ch. July 14, 2009) (Strine, V.C.) (granting advancement to two former officers and directors of a limited partnership for civil and criminal proceedings brought against them in connection with their roles at the company); *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 403 (Del. Ch. 2009) (granting advancement to former chairman and CEO of corporation to assert counterclaims in lawsuits "by reason of the fact" of his service); *Bernstein v. TractManager, Inc.*, 953 A.2d 1003, 1011 (Del. Ch. 2007) (granting advancements to former officer where officer

32

after he stopped serving, once he became a former officer and director. *Charney v. Am. Apparel*, 2015 WL 5313769, at *6-7 (Del. Ch. Sept. 11, 2015).

Although the coverage that the Company provided to Marino vested as a result of his service, the coverage did not ripen into an enforceable right until triggered by a covered claim. The point at which a covered claim triggers an enforceable right is different for advancement and indemnification.

Marino's mandatory advancement right ripened upon the existence of the covered claim. For these purposes, a covered claim is not limited to actual litigation.[22] It extends to "any civil, criminal, administrative, or investigative action, suit or proceeding" for which the covered person might receive indemnification. 8 *Del. C.* § 145(e). Importantly, because the advancement right extends "to the fullest extent permitted by law," it

---

was named as a defendant in lawsuits "by reason of" actions he allegedly took during his period of service); *Brown v. LiveOps, Inc.*, 903 A.2d 324, 329 (Del. Ch. 2006) (granting advancements to former officer and director "by reason of the fact" of his previous service); *Weinstock v. Lazard Debt Recovery GP, LLC*, 2003 WL 21843254 (Del. Ch. Aug. 8, 2003) (Strine, V.C.) (holding that a corporation's advancement provision "does not grant advancement rights solely to Indemnified Parties who are currently serving in an official capacity, but instead to all Indemnified Parties facing proceedings as defined in" the relevant provision); *Reddy v. Elec. Data Sys. Corp.*, 2002 WL 1358761, at *1-3 (Del. Ch. June 18, 2002) (Strine, V.C.) (granting advancement to former employee to defend lawsuit brought "by reason of" his service as an employee); *cf. Gentile v. SinglePoint Fin., Inc.*, 788 A.2d 111, 113 (Del. 2001) (per curiam) (denying advancement where bylaw expressly limited mandatory right of advancement to "named defendants").

[22] *See* 8 *Del. C.* § 145(e); *Brady v. i2 Techs. Inc.*, 2005 WL 3691286, at *1-2, *4 (Del. Ch. Dec. 14, 2005) (granting advancement to former executive and director for expenses relating to an internal investigation); *Tafeen v. Homestore, Inc.*, 2005 WL 789065, at *1-2 (Del. Ch. Mar. 29, 2005) (granting advancement to former officer relating to an internal investigation), *aff'd*, 888 A.2d 204 (Del. 2005).

encompasses not only any proceeding for which Marino might later be indemnified under Section 145(a) or (b), but also any proceeding for which he might later be indemnified under Section 145(c).[23]

More than the existence of a covered claim is necessary to cause Marino's mandatory indemnification right to ripen. An indemnification right ripens upon (i) the final disposition of the covered claim or (ii) in the case of statutory indemnification under Section 145(c), success on the merits or otherwise. *See Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 397 (Del. Ch. 2008) (Strine, V.C.). "It is generally premature to consider indemnification prior to the final disposition of the underlying action." *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 397 (Del. Ch. 2009).

### 1. Application To The Post-Judgment Motion

Determining whether and to what degree Marino is entitled to advancements requires applying the preceding framework to the Underlying Action. Marino only seeks advancements for defending against the Post-Judgment Motion. He has not sought advancements for any expenses incurred defending against earlier phases of the

---

[23] *See Dunlap v. Sunbeam Corp.*, 1999 WL 1261339, at *5 (Del. Ch. July 9, 1999) (holding that advancements were required under mandatory provision so long as mandatory indemnification under Section 145(c) remained a possibility); *see also Zaman v. Amedeo Hldgs., Inc.*, 2008 WL 2168397, at *16 (Del. Ch. May 23, 2008) (Strine, V.C.) (interpreting a bylaw provision that granted indemnification to an agent "to the full extent permitted by Delaware law" as encompassing mandatory indemnification as permitted by Section 145(c)); *Cochran v. Stifel Fin. Corp.*, 2000 WL 1847676, at *8 (Del. Ch. Dec. 13, 2000) (Strine, V.C.) (interpreting bylaw provision that mandated indemnification of a party serving as a director, officer, and employee of a subsidiary "to the fullest extent permitted by Delaware law" as encompassing mandatory indemnification as permitted by Section 145(c)), *aff'd in pertinent part,* 809 A.2d 555 (Del. 2002).

Underlying Action. The scope of an individual's advancement rights normally turns on the pleadings in the underlying litigation that trigger the advancement right.[24] In this case, the scope of Marino's right to advancement turns on the assertions in the Post-Judgment Motion.

The analysis of the Post-Judgment Motion in turn requires distinguishing between (i) portions of the Post-Judgment Motion in which Marino is being pursued by reason of his service as a director and officer of the Company and actions he took in those capacities and (ii) portions of the Post-Judgment Motion relating to Marino's actions after he resigned. Marino is entitled to advancement for the former. He is not entitled to advancement for the latter. *See Charney*, 2015 WL 5313769, at *6-7.

Recall that the Post-Judgment Motion relies on Section 187 of the California Code, which states:

> When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the

---

[24] *Holley v. Nipro Diagnostics, Inc.*, 2014 WL 7336411, at *8 (Del. Ch. Dec. 23, 2014) ("[I]n this case, the 'by reason of the fact' analysis requires looking to the allegations in the SEC's complaint. In that regard, I note that courts can often determine whether the 'by the reason of the fact' requirement that has been satisfied solely by examining the pleadings in the underlying litigation . . . ." (footnote omitted)); *Pontone v. Milso Indus. Corp.*, 100 A.3d 1023, 1051 (Del. Ch. 2014) ("Having re-examined the amended complaint in the Pennsylvania Action, I find that . . . Scott was made a party to the Pennsylvania Action "by reason of" his former corporate office."); *see also Tafeen*, 888 A.2d at 207 (examining allegations in underlying proceedings); *Brown*, 903 A.2d at 328-29 (looking at complaint from underlying litigation in conducting "by reason of the fact" analysis); *Reddy*, 2002 WL 1358761, at *2 (examining criminal and civil complaint in conducting "by reason of" analysis).

statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code.

Cal. Civ. Proc. Code § 187. To add a post-judgment debtor under Section 187, the movant must show "(1) that the new party be the alter ego of the old party and (2) that the new party had controlled the litigation, thereby having had the opportunity to litigate, in order to satisfy due process concerns." *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1148 (9th Cir. 2004) (quotation marks omitted); *accord Mesler v. Bragg Mgmt. Co.*, 702 P.2d 601, 612 (Cal. 1985) (en banc) (requiring the movant to show (i) the new party was the alter ego of the old party, (ii) "due diligence on the part of the plaintiff," and (iii) the new party participated in the underlying defense).

The Post-Judgment Motion focuses in large part on action that Marino took in a covered capacity while serving as a director and officer of the Company, but it also involves some conduct that took place after Marino resigned from his positions with the Company. In the Post-Judgment Motion, Sierra states that "Marino personally participated in the conduct underlying the judgment." Dkt. 28, Ex. at 25. Sierra supports this assertion with the following:

> [T]he Court already held [Marino] was personally involved in the conduct underlying the judgment. In its Order Denying [the Company's] Rule 50(b) and 59 Motions, the Court held that Marino's personal conduct was "sufficient to show repeated trickery and deceit" on the part of [Parent] and [the Company]. The Court concluded that Marino . . . told Sierra that [the Company] would take no action at McClellan without Sierra, and that [the Company's] illicit bid was merely a "second bite at the apple" for Sierra. The Court also concluded that Marino himself "convinced Sierra to lower its capital investment offer" to McClellan, after which [the Company] submitted a bid doubling Sierra's offer. Sierra relied on Marino's misrepresentations to its detriment and incurred severe damages.

36

*Id.* at 26 (citations and formatting omitted). These assertions depend on Marino exercising corporate authority as an officer of the Company and involve covered conduct. *Cf. Charney*, 2015 WL 5313769, at *6-7.

Sierra also contends in the Post-Judgment Motion that Marino received confidential information from Sierra in his capacity as the Company's CEO, then caused the Company to use Sierra's confidential information to bid in response to and win McClellan's request for proposal. This is covered conduct. *See LiveOps*, 903 A.2d at 326 (finding causal connection requirement satisfied where former officer allegedly misappropriated the corporation's trade secrets while a director).

The Post-Judgment Motion similarly implicates covered conduct by arguing that Parent and Great-Grandparent were alter egos of the Company before the Stock Sale, during Marino's time as the Company's Chairman and CEO. *See* Dkt. 28, Ex. at 1. In support of that argument, Sierra claims that:

- "Marino dominated and controlled" the Company before the Stock Sale.

- The "pre-sale" Company was an "arm[] and instrumentalit[y] of Marino."

- Marino "managed" the Company as the "operational arm" of his family of entities, "in pursuit of common business purpose."

- Marino was in charge of the Company's daily operations.

- Marino had final approval on everything that took place within the Company.

*Id.* at 19-22. Without expressing a view on whether allegations of this type would be sufficient to establish alter ego liability, which is an issue for the California Court, these

37

contentions necessarily invoke Marino's corporate authority as the senior officer of the Company.

A separate aspect of the Post-Judgment Motion, however, rests only partially on Marino's conduct in a covered capacity. Sierra argues that Section 187 permits a party to be added as a judgment debtor when the party participated in the litigation that gave rise to the judgment. *See id.* at 2. Before the Stock Sale, Marino supervised and controlled the litigation in his capacity as the senior officer at the Company. He remained in that role for the first four years of the proceedings. After the Stock Sale, however, Marino resigned from his positions with the Company. At that point, he may have participated in the litigation through his control of Grandparent, but his involvement was not "by reason of" his service to the Company. He is entitled to advancement for his pre-resignation control over the litigation but not for his post-resignation involvement.

A final aspect of the Post-Judgment Motion does not involve covered conduct. The Pre-Judgment Motion asserts that Marino engaged in the Fund Transfers to defraud Sierra. Sierra further alleges that Marino caused the Company and Grandparent to represent to the California Court that "there would be no shifting or moving of assets to avoid judgment," then contradicted that representation by effecting the Fund Transfers. *Id.* at 23. These representations were made in June 2013, after the Stock Sale closed and Marino resigned from all positions with the Company. Likewise, the Fund Transfers occurred after the Stock Sale closed. The Company never received any funds. Parent sold the Company's stock to Buyer, and Parent received the money. Marino did not exercise

Company authority in connection with any of these actions, and he is not entitled to advancements for defending this aspect of the Post-Judgment Motion.

## 2. Implementation Going Forward

Marino is thus entitled to some but not all of the fees and expenses that he has and will incur defending against the Post-Judgment Motion. To implement this ruling, the parties shall proceed as follows:

1. Before the fifth calendar day of each month, Marino's counsel will submit an advancement demand for fees and expenses incurred during the previous month. Any fees or expenses not included in the demand are deemed waived. The advancement demand will include the following:

    a. A detailed invoice identifying the fees and expenses for which advancement is requested. The invoice shall provide for each time entry the date, timekeeper, billing rate, task description, time incurred, and amount charged. The invoice shall identify with detail for each expense the date of the charge, its nature, and the amount incurred.

    b. A certification signed by the senior member of the Delaware bar representing Marino attesting that (i) he personally reviewed the invoice, (ii) each time entry and expense falls within the scope of Marino's advancement rights, (iii) in his professional judgment, the fees and expenses charged are reasonable in light of the factors listed at Rule 1.5(a) of the Delaware Lawyers' Rules of Professional Conduct, and (iv) the services rendered were thought prudent and appropriate in his good faith professional judgment.

2. Before the tenth calendar day of the month, the Company's counsel will respond to the advancement demand in writing. The response shall identify each specific time entry or expense to which the Company objects and explain the nature of the objection. The senior member of the Delaware bar representing the Company shall certify that (i) he personally reviewed the advancement demand and (ii) in his professional judgment, the disputed fees and expenses are not reasonable or otherwise fall outside the scope of the advancement right. The response shall cite any legal authority on which the Company relies. Any objection not included in the response is deemed waived.

3. The Company shall pay the undisputed amount contemporaneously with the response. If the Company disputes more than 50% of the amount sought in any

advancement demand, the Company shall pay 50% of the amount sought and Marino's counsel shall hold the amount exceeding the undisputed amount in its escrow account pending resolution of the dispute regarding such portion.

4.  Before the fifteenth calendar day of each month, Marino's counsel will reply to the advancement response in writing and provide supporting information and authority.

5.  Before the twentieth calendar day of the month, the senior members of the Delaware bar representing each side will meet, in person, and confer regarding any disputed amounts. Any additional advancements that results from the meet-and-confer session will be paid with the next month's payment of undisputed amounts.

6.  Not more frequently than quarterly, Marino may file an application pursuant to Court of Chancery Rule 88 seeking a ruling on the disputed amounts. Briefing shall consist of a motion, an opposition filed within fifteen days of the motion, and a reply filed within ten days of the opposition. Marino and the Company shall not raise any new arguments not previously raised with the other side in the applicable demand, response, reply, or meet-and-confer. Marino and the Company only shall cite authorities identified in writing in the applicable demand, response, or reply. The court will determine if a hearing is warranted.

7.  If the court grants an application in whole or part, then pre-judgment interest is due on the adjudicated amount from the date of the applicable advancement demand.

8.  If the court grants an application in whole or part, then in parallel with the next advancement demand, Marino may demand indemnification for the fees and expenses incurred in connection with the granted application, proportionate to the extent of success achieved. The parties shall address the indemnification demand in the same manner as the advancement demand. Except in connection with a successful application, Marino shall not seek or receive advancement or indemnification for time spent preparing invoices and advancement demands, addressing responses, or conferring regarding advancement requests.

## F.  Fees On Fees

Because Marino succeeded in part on the merits of his claim for advancements, he is entitled to an award of fees and expenses proportionate to his success. *See* 8 *Del. C.* § 145(c); *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002); *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 178, 183 (Del. Ch. 2003) (Strine, V.C.). Delaware

corporations "remain free to tailor their indemnification bylaws to exclude 'fees on fee's,' if that is a desirable goal." *Stifel*, 809 A.2d at 561-62. The charter provision in this case does not exclude fees on fees.

Marino prevailed in his request for advancement, but not on all points. Marino is entitled to a proportionate recovery of his fees and expenses. *See Levy v. HLI Operating Co., Inc.*, 924 A.2d 210, 226-27 (Del. Ch. 2007). Marino shall make an application for a specific amount pursuant to paragraph 8 of the procedures set out in the preceding section. *See* Part II.E.2, *supra*.

## III.     CONCLUSION

Marino's motion for summary judgment is granted. The Company's motion is denied.