# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MUTHU NARAYANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11757-VCMR |
| | ) | |
| SUTHERLAND GLOBAL HOLDINGS | ) | |
| INC., a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 8, 2016
Date Decided: July 5, 2016

Garrett B. Moritz, Nicholas D. Mozal and Benjamin Z. Grossberg, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Plaintiff Muthu Narayanan.*

Daniel A. Dreisbach and J. Scott Pritchard, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joseph B. Schmit, PHILLIPS LYTLE LLP, New York, New York; *Attorneys for Defendant Sutherland Global Holdings, Inc.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This post-trial opinion grants a plaintiff-director's demand for the advancement of legal fees and expenses incurred defending against criminal proceedings in India and civil proceedings in the United States. The plaintiff served as a director and officer of the defendant-company's India subsidiary for many years, but this dispute arises from his service as a director of two additional entities, one owned by the subsidiary and the other owned by the company's chairman, chief executive officer, and controlling stockholder. These additional entities were formed as vehicles for acquiring and developing land in India. Because of India's property laws and real estate market conditions, the controlling stockholder retained the services of two land aggregators to facilitate the land development projects. The plaintiff-director oversaw the advancement of millions of dollars to the aggregators for the purpose of acquiring contiguous land on behalf of each entity. But the land development projects did not go as planned. After one of those aggregators was imprisoned on conspiracy charges, the controlling stockholder intervened and initiated an investigation.

Two years later, the plaintiff-director sought to retire and exercise certain stock options, but the controlling stockholder refused those requests because the defendant-company had not recovered the money it had advanced to the land aggregators. After efforts to convince the defendant-company to pay proved fruitless, the plaintiff-director sued the defendant-company in the United States

1

District Court for the Western District of New York. The defendant-company raised the affirmative defense that the plaintiff-director's breaches of his fiduciary duties regarding the land transactions led to damages purportedly in excess of the amount the plaintiff-director was seeking and counterclaimed that the plaintiff-director never provided his full cooperation to collect the missing funds. Thereafter, the plaintiff-director sought advancement to fund his response to the set-off defense and counterclaim; the defendant-company refused. The plaintiff-director later commenced this action.

After post-trial briefing, three issues remain. First, the parties dispute whether two sources of indemnification, the defendant-company's bylaws and an indemnification agreement, must be read together or separately. Second, the parties dispute whether the plaintiff-director served the entity owned by the controller at the defendant-company's request or for his own personal benefit. Third, the parties dispute whether the Court should delay granting the plaintiff-director's fee requests, fees-on-fees, and pre-judgment interest claims until after the Court determines the defendant-company is liable for those fees. For the reasons that follow, the Court decides each issue in the plaintiff-director's favor and awards him the fees and expenses, fees-on-fees, and pre-judgment interest he seeks.

# I. BACKGROUND AND PROCEDURAL HISTORY[1]

The Court held a one-day trial on February 10, 2016. The parties submitted a list of more than 200 joint exhibits, which were admitted into evidence by joint pre-trial stipulation except as noted therein. Three fact witnesses testified at trial. The pre-trial and post-trial briefing totaled 186 pages.

Except where noted, the following facts are undisputed. To the extent certain facts are at issue, however, they are addressed specifically in the Analysis.[2] Also, to the extent any of the following background facts are relevant to the merits of the parties' underlying disputes, they are not binding.

## A. Facts

### 1. Parties and relevant non-parties

Plaintiff Muthu Narayanan is a chartered accountant and fellow member of the Institute of Chartered Accountants of India, which is similar to a certified public accountant ("CPA") in the United States. Narayanan graduated from the University of Madras with a degree in commerce and completed his chartered accountancy course in 1979. For many years, Narayanan practiced with a firm that provided accounting, taxation, auditing, and consultancy services. The Lalah

---

[1]    Citations to the testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. Exhibits are cited as "JX #."

[2]    *See infra* Part III.

Spices company was one of the firm's leading clients, and Narayanan came to know the family that owned Lalah Spices well during that time.

Non-party Dilip Vellodi is the controlling stockholder, Chairman, and Chief Executive Officer ("CEO") of Defendant Sutherland Global Holdings, Inc. ("Sutherland" or the "Company"). Sutherland helps clients in the United States to acquire and retain customers in the telecommunications and technology sectors. Narayanan met Vellodi in 1986 through his relationship with the Lalah Spices family.[3]

Non-party D. Muthunarayanan & Co. ("DMNC") is a firm Narayanan started under his own name in 1994. In 1999 or 2000, both Vellodi and his wife requested Narayanan's consulting services in starting Sutherland's operations in India. Narayanan retired as a partner in DMNC in 2007[4] because he was devoting most of his time to Sutherland and sensed that his partners were not pleased.[5] Despite retiring, Narayanan allowed DMNC to continue using his name and promoting itself with his credentials.[6]

---

[3]     Tr. 7 (Narayanan).

[4]     *Compare* JX 209 (reflecting a partnership interest as of January 1, 2007), *with* JX 210 (reflecting no partnership interest as of January 1, 2008).

[5]     Tr. 11 (Narayanan).

[6]     *Id*; *see also* JX 134.

4

Sutherland Global Services Private Limited is Sutherland's India subsidiary ("India Operating Sub"). Around 2004, Narayanan became an employee and joined the boards of Sutherland and India Operating Sub at the request of Sutherland's then-Chief Financial Officer ("CFO"), some of Sutherland's new private equity investors, and Vellodi. When Narayanan became involved with India Operating Sub, it employed five people, which Narayanan increased to about 14,000 by the time he retired in 2014. At all times relevant to this action, K.S. Kumar was India Operating Sub's Executive Vice President and Head of Global Operations.

K.R.V. Properties Private Limited ("KRV") and Sutherland Development Company Private Limited ("SDC") are entities formed to develop real estate (the "KRV" and "SDC Land Development Projects," respectively). Kamalesh Kumarseth ("Kamalesh") and S. Venkataramanan ("Ramanan") are two land aggregators Vellodi retained to pursue the KRV and SDC Land Development Projects.[7] In addition, Kamalesh is Vellodi's brother-in-law, and Ramanan is Kamalesh's business partner.

---

[7] *See* Tr. 17-18 (Narayanan) ("Q. And how was Ramanan selected as one of the land aggregators? A. Because Dilip, who selected them, Kamalesh Kumar—Kumar Kamalesh is the brother-in-law of Dilip. That is wife's brother. And Ramanan is the partner of Kamalesh. Dilip brought them to the table to help aggregating land for K.R.V.").

Mike Russo, who has a Bachelor of Science in accounting from Rochester Institute of Technology and is a CPA in the State of New York, has long been familiar with Sutherland's affairs. Sutherland and Vellodi are both clients of Russo's firm, Freed Maxick CPAs, P.C. ("Freed Maxick"). Russo also works as Sutherland's legal coordinator.

S. Gopinath ("Gopi") is Narayanan's personal assistant.

### 2. KRV and SDC Land Development Projects

As a director of Sutherland, Narayanan became involved in the KRV and SDC Land Development Projects at Vellodi's request or on behalf of Sutherland.[8] In 2006, Vellodi hired DMNC to form KRV and asked Narayanan to serve as a director of the entity.[9] To comply with India law, which requires corporations to have at least two stockholders, Narayanan took shares that later amounted to about 0.1% of KRV; Vellodi owns the remaining 99.9%.[10] Narayanan neither was paid

---

[8]     Tr. 13 (Narayanan) ("I was requested to be a director and form [KRV]."); Tr. 21 ("Q. . . . [D]id there come a time when Mr. Vellodi asked you to acquire land for a Sutherland Global subsidiary? A. Correct.").

[9]     *Id.* at 12-13. Sutherland does not contest seriously whether Narayanan served as a director of KRV at Vellodi's request. Instead, it argues that Narayanan's activities relating to KRV were outside business interests unrelated to his service as a director of Sutherland. In any event, Narayanan's motivation to serve KRV—both as a director and otherwise—is a central issue in this case and is discussed in greater detail below.

[10]     *Id.* at 13 ("Dilip had injected a lot of money, and he has a lot of shares from time to time. And that's how he ends up owning 99.9%. And that 5,000 shares that I owned is now .1 percent. There's no longer 50/50 as it shows [in JX 1].").

by KRV nor received distributions from the entity but served the entity solely at Vellodi's request.[11]  Vellodi also retained Kamalesh and Ramanan to act as land aggregators for the KRV and SDC Land Development Projects.  Kamalesh, Ramanan, and Vellodi engaged in KRV's business together, and Vellodi "was very much involved [in] the nitty-gritty level."[12]  By 2010, KRV had purchased a majority of the land sought.  Of the nineteen-and-a-half acres acquired, nearly fourteen were contiguous, which Narayanan described as "successful."[13]

In June 2009, Kumar proposed acquiring and developing land for India Operating Sub's business campus in the Perumbakkam region of India.  At Vellodi's instruction, India Operating Sub created SDC to acquire land and asked Narayanan to be a director of this entity.  The local government had allotted Sutherland certain lands on a ninety-year leasehold basis for Sutherland's campus, but Vellodi decided it was better to own the land on a freehold basis without the lease restriction.[14]  Vellodi directed Narayanan to continue to use Ramanan as a land aggregator.[15]  On March 11, 2010, SDC authorized Narayanan to negotiate the

---

[11]     *Id.* at 14-15.

[12]     *Id.* at 19-20 (Narayanan); JX 7.

[13]     Tr. 20.

[14]     *Id.* at 22 (Narayanan).

[15]     *Id.* at 24 (Narayanan).

purchase of lands on its behalf.[16]

The land registration process proceeded smoothly until a new registrar in the area doubled a government-levied stamp duty from 9% to 18% on the theory that the aggregators' participation as KRV's and SDC's intermediaries made the land aggregation two transactions. An attorney, Udayakumar, recommended appealing to the Inspector General of Registration, which the attorney advised would take approximately two months.[17] The appeal ultimately took four months, during which time SDC suspended registration of lands to avoid incurring unnecessary stamp duty. During the delay in registration, the price of land in the region increased, which harmed SDC's efforts in registering certain lands as owners refused to proceed with transactions at prices to which they already had agreed.[18]

---

[16] *Id.* at 28 (Narayanan); JX 18.

[17] *Id.* at 31-32 (Narayanan).

[18] *Id.* at 43-45 (Narayanan). To protect SDC, Narayanan instructed the financial controller and finance team to account for the advances for which lands were not registered within three to four weeks and, at the end of each month, aggregate and secure those advances by taking promissory notes and undated checks from Ramanan. *Id*. at 32-33. The promissory notes were valid for three years unless renewed, and if the checks, once dated, were dishonored, a criminal action could be instituted against Ramanan under the Indian Negotiable Instruments Act. *Id.* at 33 (Narayanan). When Narayanan left Sutherland, all of the promissory notes were valid. *Id.* at 34.

### 3. Freed Maxick's internal investigation

In July 2013, the parties realized that the SDC Land Acquisition Project was not going as planned when they learned that Ramanan was imprisoned for work done in a similar capacity. This raised red flags at Sutherland,[19] and Sutherland engaged Russo and Freed Maxick to investigate and report on its findings.[20] Sutherland and Freed Maxick memorialized this engagement in a letter dated August 20, 2013 (the "Engagement Letter").[21]

Russo traveled to India to investigate Ramanan's dealings with SDC. When he spoke with Narayanan, however, Russo learned that Ramanan had been aggregating land for SDC and KRV. Russo began investigating KRV while his team, which arrived some time later, investigated SDC. The team detailed their findings in separate letters to Vellodi dated September 12, 2013 (the "KRV Report" and the "SDC Report").[22] Narayanan and Gopi provided information to Russo regarding KRV.[23] Russo spoke with Narayanan, Vellodi, and SDC's

---

[19]   *Id.* at 177 (Russo).

[20]   *Id.* at 176-77 (Russo); JX 310.

[21]   JX 310.

[22]   JX 45 (KRV Report); JX 41 (SDC Report).

[23]   Tr. 185 (Russo).

financial controller, Prasad, regarding SDC.[24]  Although Russo thought Narayanan was helpful in providing information, he reached conclusions independently that differed from Narayanan's statements.  In Russo's opinion, Narayanan's "logic didn't seem to hold itself together," and his "story just wasn't overly credible."[25] Nonetheless, Sutherland chose not to enforce the undated checks and promissory notes against Ramanan or to initiate criminal prosecution.[26]  Instead, Sutherland purportedly relied on Narayanan's representations that doing so would hurt the chances of getting Ramanan to either deliver the land or return the advances.[27]  On November 13, 2013, Vellodi, Kumar, and Narayanan signed a memorandum relating to the land issues that authorized Kumar "to deal with the matter" related to Ramanan and the advances made on the land.[28]  These efforts apparently continued, but none of the parties were able to recover the advances or the land.

### 4.    New York Action and India Criminal Proceedings

By 2014, Narayanan was sixty-two years old and had worked at Sutherland for over fifteen years.  Narayanan communicated his desire to retire to Vellodi,

---

[24]    *Id.* at 196, 198-99.

[25]    *Id.* at 186.

[26]    *Id.* at 189 (Russo).

[27]    *Id.* at 188 (Russo).

[28]    JX 55.

who requested that Narayanan stay on until a pending, unrelated transaction closed that fall.[29] In September 2014, Sutherland allowed its stock option holders to exercise their options on a net basis with the requirement that they sell back to Sutherland 30% of the shares received.[30] In October, Narayanan requested the option to sell back to Sutherland 100% of the shares he would receive, which Sutherland purportedly accepted.[31] By the end of that month, the pending, unrelated transaction had closed. Narayanan retired shortly thereafter,[32] but he was not paid for his shares.

Narayanan spoke with Russo about getting paid, but learned that Vellodi was conditioning payment on completion of the SDC and KRV Land Development Projects.[33] A short time later, Vellodi contacted Narayanan to find out why Narayanan was not coming into the office. Narayanan explained that he had retired and wanted to be paid for his shares, but Vellodi both insisted that

---

[29]     Tr. 59 (Narayanan).

[30]     *Id.* at 60 (Narayanan) (explaining that "the stock option holders were given an option to exercise on a net basis and any cash 30 percent"); *see also* JX 109, Ex. B ("New York Action Complaint") ¶4(b) (alleging Narayanan was required to "agree to sell 30% of the Net Settlement Shares received by [Narayanan] via his Net Exercise back to [Sutherland]").

[31]     Tr. 60.

[32]     JX 76 ("Sutherland acknowledges that your employment with the Company ceased effective October 23, 2014 . . . .").

[33]     Tr. 61.

11

Narayanan continue working for Sutherland and conditioned Narayanan's receipt of payment for his shares on completion of the land transactions.[34] According to Narayanan, Vellodi then accused him of stealing money from the company and threatened that if Narayanan continued seeking payment, he and his family would suffer.[35] Narayanan continued to pursue payment for his shares by contacting Russo's firm, Vellodi, and the Board. No one responded.[36] In February 2015, Narayanan decided to take legal action.

On March 25, 2015, Narayanan filed an action in the United States District Court for the Western District of New York (the "New York Action").[37] The complaint in the New York Action included claims for breach of contract and unjust enrichment arising from two agreements and sought nearly $2 million in damages. Sutherland filed its answer, defenses, counterclaims and jury demand on June 15, 2015.[38] As a defense, Sutherland alleged that Narayanan breached fiduciary duties to Sutherland in connection with the land transactions and, as a

---

[34]     *Id.* at 62-63.

[35]     *Id.* at 63 (Narayanan) ("Then [Vellodi] shouted and said, 'Hey, if you continue to do this, you and your family will suffer.'").

[36]     *Id.* at 64.

[37]     New York Action Complaint.

[38]     JX 92.

result, owes Sutherland more money than Sutherland owes him for his shares.[39] Additionally, Sutherland alleged as a counterclaim that Narayanan never provided his full cooperation in good faith to collect missing funds that he improperly had exchanged for unenforceable promissory notes.[40]

On August 1, 2015, Vellodi instructed Kumar to file on behalf of KRV a criminal complaint against Narayanan in Chennai, India, for allegedly breaching his duties to KRV (the "KRV Criminal Proceedings").[41] That same day, the commissioner of police registered the first information report against Narayanan and sought his arrest.[42] Narayanan was denied anticipatory bail and was imprisoned for about twenty days.[43] Then, on August 12, 2015, Kiran Verghese Thomas, again authorized by Vellodi, filed a similar criminal complaint against Narayanan on behalf of SDC (the "SDC Criminal Proceedings" and, together with the KRV Criminal Proceedings, the "India Criminal Proceedings").[44] Shortly thereafter, however, Narayanan won bail as to the SDC and KRV complaints on

---

[39]    Tr. 67; JX 92.

[40]    Tr. 70; JX 92.

[41]    Tr. 57-58 (Narayanan).

[42]    *Id.* at 72-73 (Narayanan); JX 98.

[43]    Tr. 73.

[44]    *Id.* at 76-77 (Narayanan); JX 103.

September 28, 2015[45] and September 30, 2015,[46] respectively. Both judges who granted Narayanan bail reasoned generally that there was no material evidence linking Narayanan to the alleged criminal activities.[47]

### B. Delaware Action

Currently, Narayanan is subject to the India Criminal Proceedings and is defending against Sutherland's set-off defense and counterclaim in the New York Action (together, the "Underlying Proceedings"). The parties' substantive arguments in the Underlying Proceedings, however, are not at issue here. Instead, this action (the "Delaware Action") relates to whether and to what extent Narayanan has the right to demand that Sutherland advance his legal fees and expenses to defend himself in the Underlying Proceedings.[48]

Three instruments bear on Narayanan's disputed right to advancement. First, Sutherland's certificate of incorporation authorizes Sutherland, to the fullest extent permitted by applicable law, "to provide indemnification of (and advancement of expenses to) [Narayanan] . . . through bylaw provisions, agreements . . . , vote of stockholders or disinterested directors or otherwise, in

---

[45]   Tr. 79; JX 104.

[46]   Tr. 73-74; JX 105.

[47]   Tr. 74; JX 104-05.

[48]   Narayanan does not seek advancement for fees relating to the pursuit of his claims in the New York Action. *See infra* notes 98-102 and accompanying text.

excess of the indemnification and advancement otherwise permitted by Section 145" of the Delaware General Corporation Law ("DGCL"), subject to certain limitations created by the DGCL or other state laws, "with respect to actions for breach of duty to a company, its stockholders, and others."[49] Sutherland expressly provided such expanded rights by adopting bylaws and entering into an agreement with Narayanan to provide mandatory advancement.

Second, Sutherland's bylaws, effective March 5, 2013 (the "Bylaws"), include the following relevant provisions:

> Section 1. RIGHT TO INDEMNIFICATION OF DIRECTORS AND OFFICERS. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person in such proceeding. Notwithstanding the preceding sentence, except as otherwise provided in

---

[49] JX 29 ("Certificate") Article NINTH.2.

<u>Section 3</u> of Article VII of these Bylaws, the Corporation shall be required to indemnify a Covered Person in connection with a proceeding (or part thereof) commenced by such Covered Person only if the commencement of such proceeding (or part thereof) by the Covered Person was authorized in advance by the Board of Directors.

Section 2.   PREPAYMENT OF EXPENSES OF DIRECTORS AND OFFICERS.  The Corporation shall pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any proceeding in advance of its final disposition, <u>provided</u>, <u>however</u>, that, to the extent required by law, such payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this Article VII or otherwise.

Section 3.   CLAIMS BY DIRECTORS AND OFFICERS.   If a claim for indemnification or advancement of expenses under this Article VII is not paid in full within 30 days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.   In any such action the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

. . . .

Section 6.  NON-EXCLUSIVITY OF RIGHTS.  The rights conferred on any person by this Article VII shall not be exclusive of any other rights which such person

16

may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of stockholders or disinterested directors or otherwise.[50]

Third, "to attract and retain the involvement of highly qualified persons, such as [Narayanan], to serve and be associated with the Company," Sutherland also entered into an indemnification agreement with Narayanan, effective March 5, 2013 (the "Indemnification Agreement").[51]   The Indemnification Agreement includes the following relevant provisions:

> 2. **Indemnification**.
>
> (a) <u>Indemnification of Expenses</u>.   Subject to the provisions of Section 2(b) below, the Company shall indemnify, exonerate or hold harmless [Narayanan] for Expenses to the fullest extent permitted by law if [Narayanan] was or is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, any Claim (whether by reason of or arising in part out of a Covered Event), including all interest, assessments and other charges incurred in connection with or in respect of such Expenses.[52]

---

[50]   JX 31 ("Bylaws") art. VII §§ 1-3, 6.

[51]   JX 30 ("Indemnification Agreement"), Recital D.

[52]   Indemnification Agreement § 2.  "Claim" means,

> with respect to a Covered Event (as defined below) any threatened, asserted, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, or any hearing, inquiry or investigation that [Narayanan] in good faith believes might lead to the institution of any such action,

17

3. **Expense Advances**.

(a) Obligation to Make Expense Advances. The Company shall make Expense Advances to [Narayanan] upon receipt of a written undertaking by or on behalf of [Narayanan] to repay such amounts if it shall ultimately be determined that [Narayanan] is not entitled to be indemnified, exonerated or held harmless therefor by the Company.

(b) Form of Undertaking. Any written undertaking by [Narayanan] to repay any Expense Advances hereunder shall be unsecured and no interest shall be charged thereon.[53]

---

suit, proceeding or alternative dispute resolution mechanism, whether civil, criminal, administrative, investigative or other.

Indemnification Agreement § 1(b). Further, "Covered Event" means,

any event or occurrence related to the fact that [Narayanan] is or was a director, officer, employee, agent or fiduciary of the Company, or any subsidiary of the Company, direct or indirect, or is or was serving at the request of the Company as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust or other enterprise, or by reason of any action or inaction on the part of [Narayanan] while serving in such capacity.

Indemnification Agreement § 1(d).

[53]  Indemnification Agreement § 3.  "Expense Advance" means "a payment to [Narayanan] for Expenses pursuant to Section 3 hereof, in advance of the settlement of or final judgment in any action, suit, proceeding or alternative dispute resolution mechanism, hearing, inquiry or investigation, which constitutes a Claim." Indemnification Agreement § 1(e).

18

4. **Procedures for Indemnification and Expense Advances**.

. . . .

(b) <u>Notice/Cooperation by [Narayanan]</u>. [Narayanan] shall, as a condition precedent to [his] right to be indemnified, exonerated or held harmless or [his] right to receive Expense Advances under this Agreement, give the Company notice in writing as soon as practicable of any Claim made against [him] for which indemnification, exoneration or hold harmless right will or could be sought under this Agreement. Notice to the Company shall be directed to the President and the Secretary of the Company at the address shown on the signature page of this Agreement . . . . In addition, [Narayanan] shall give the Company such information and cooperation as it may reasonably require and as shall be within [his] power.[54]

5. **Additional Indemnification Rights; Nonexclusivity**.

. . . .

(b) <u>Nonexclusivity</u>. The indemnification, exoneration or hold harmless rights and the payment of Expense Advances provided by this Agreement shall be in addition to any rights to which [Narayanan] may be entitled under the Company's Certificate of Incorporation, its bylaws, any other agreement, any vote of stockholders or disinterested directors, the DGCL, or otherwise.[55]

Notably, Section 4(b) of the Indemnification Agreement (the "Cooperation Provision") does not appear in the Bylaws.

---

[54] Indemnification Agreement § 4.

[55] Indemnification Agreement § 5.

19

On October 19, 2015, Narayanan sought to perfect his advancement rights by mailing to Sutherland his Notice of Claim and Demand for Indemnification and Payment of Expense Advances (the "Initial Notice").[56] Narayanan described the claims made against him in the Underlying Proceedings for which he requested indemnification and advancement. Narayanan also attached an undertaking to repay the advancement should it be determined later that he is not entitled to indemnification. After Sutherland failed to pay advancement to Narayanan, he filed a complaint on November 30, 2015 asserting two causes of action (the "Complaint"). Count I seeks advancement for Narayanan's fees and expenses, along with pre-judgment interest, arising from Sutherland's set-off defense and counterclaim in the New York Action and the India Criminal Proceedings. Count II seeks advancement for Narayanan's fees and expenses arising from his pursuit of this Delaware Action ("fees-on-fees").

On December 14, 2015, Narayanan mailed to Sutherland his Supplemental Notice of Claim and Demand for Indemnification and Payment of Expense Advances reflecting fees and expenses incurred in commencing this action (the "Supplemental Notice").[57] The Supplemental Notice mirrored the Initial Notice, but added a demand for advancement with respect to this action. Sutherland never

---

[56]    Tr. 87; JX 109.

[57]    Tr. 88; JX 122.

20

responded to either demand.

On December 15, 2015, the Court granted a stipulated order governing the case schedule. The parties submitted simultaneous opening and answering briefs on January 26 and February 1, 2016, respectively, and the Court held a one-day trial on February 10, 2016. Thereafter, the parties submitted post-trial briefs, and post-trial oral arguments were held on March 8, 2016.

## C. Contentions

Post-trial briefing revealed that the following three issues remain: (1) whether the Bylaws and the Indemnification Agreement must be read conjunctively or disjunctively; (2) whether Narayanan served KRV at the request of Sutherland; and (3) whether the Court should delay deciding the reasonableness of Narayanan's fee requests to date, fees-on-fees, and pre-judgment interest claims until after the Court resolves Sutherland's liability for those fees. This opinion concludes as follows: (1) the Bylaws are a separate and independent source of indemnification and advancement rights that do not condition Narayanan's receipt of advancement on his "cooperation"; (2) Vellodi's request that Narayanan serve as a director of the KRV and SDC entities satisfies the advancement provisions, and Sutherland is thereby liable to Narayanan for the advancement he seeks (including fees-on-fees and pre-judgment interest) with respect to each of the Underlying Proceedings; and (3) there is no reason to further delay vindicating

21

Narayanan's right to advancement.

## II. ANALYSIS

### A. Legal Standard

Ordinarily, a plaintiff has the burden of proving each element of each of its causes of action against each defendant by a preponderance of the evidence,[58] where proof by a preponderance of the evidence means proof that something is more likely than not.[59] Here, however, the parties agree that, under either's theory of the case, the Bylaws require Sutherland to prove that Narayanan is not entitled to advancement.[60]

### B. The Bylaws and Indemnification Agreement Are Disjunctive

Sutherland argues that Narayanan is not entitled to advancement because he failed to satisfy the condition precedent that he cooperate with Sutherland, which, here, means that Narayanan failed to cooperate adequately with Freed Maxick's investigation and Sutherland's attempts to recover funds advanced to Ramanan.

---

[58] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015); *In re Genelux Corp.*, 2015 WL 6393840, at *19 (Del. Ch. Oct. 22, 2015).

[59] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

[60] Bylaws art. VI § 3 ("In any such action the Corporation shall have the burden of proving that [Narayanan] is not entitled to the requested indemnification or advancement of expenses under applicable law.").

22

Although Sutherland admits that the Cooperation Provision only appears in the Indemnification Agreement, Sutherland argues that, because the parties entered into the agreements contemporaneously and thereby intended the Bylaws and the Indemnification Agreement to be read conjunctively, the Court should enforce the Cooperation Provision as a condition precedent to Narayanan's right to receive advancement under either source. Sutherland further argues that the proper scope of the Cooperation Provision is broad and that Narayanan failed to satisfy the Cooperation Provision.[61]

Narayanan contends that the Court need not reach the factual issue, however, because the Bylaws, which are a separate and independent source of advancement rights, include no cooperation requirement. Next, Narayanan argues that, even if the Court reads the Bylaws and the Indemnification Agreement conjunctively, the Cooperation Provision cannot be read as broadly as Sutherland contends, since the facts upon which Sutherland relies constitute the substance and merits of the Underlying Proceedings and, as such, should not be decided here. In the alternative, Narayanan maintains that, at every turn, he actually provided Sutherland as much cooperation as was within his power and as Sutherland could reasonably require. Although the evidence supports each of Narayanan's three

---

[61] Oral Arg. Tr. 33-34.

arguments, the Court reaches only whether the Bylaws and Indemnification Agreement are disjunctive.

### 1. Controlling law

Section 145 of the DGCL governs indemnification and advancement. Subject to certain limitations, a corporation has discretionary authority to provide indemnification under subsections (a) and (b) and advancement under subsection (e), but must provide indemnification in certain circumstances pursuant to subsection (c). As relevant here, Section 145(f) makes clear that the indemnification and advancement rights under the DGCL are not exclusive of any additional indemnification and advancement rights a corporation chooses to provide through a separate instrument. To that end, the first sentence of Section 145(f) (the "Non-Exclusivity Clause") states, in relevant part:

> The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section *shall not be deemed exclusive of any other rights* to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office.[62]

---

[62]    8 *Del. C.* § 145(f) (emphasis added).

Vice Chancellor Laster reviewed Section 145's legislative history recently in *Marino v. Patriot Rail Company*.[63] In short, during the three years before the DGCL was overhauled in 1967, "no subject was more discussed among members of the corporate bar than the subject of indemnification of officers and directors."[64] Although Section 145 was modernized at that time, the language of the Non-Exclusivity Clause largely was unchanged from the pre-1967 version. "Both the old and new indemnification statute declare that their provisions are not exclusive of other rights under any 'by-law, agreement, vote of stockholders or disinterested directors or otherwise.'"[65] The drafting committee said the power to indemnify was "non-exclusive so that other rights to indemnification may still exist by contract, by-law or charter within such limits of public policy as the courts may establish."[66] "Thus, one may become entitled to indemnification outside the terms of the statute by virtue of an express contract awarding indemnity, such as an

---

[63]    131 A.3d 325, 332-43 (Del. Ch. 2016).

[64]    S. Samuel Arsht & Walter K. Stapleton, *Delaware's New General Corporation Law: Substantive Changes*, 28 BUS. LAW. 75, 77-78 (1967).

[65]    ERNEST L. FOLK, III, THE DELAWARE GENERAL CORPORATION LAW: A COMMENTARY AND ANALYSIS 101 (1972) (quoting 8 *Del. C.* § 145(f)).

[66]    Arsht & Stapleton, *supra* note 64.

agreement between a corporation and an executive to terminate employment."[67] "[T]o secure indemnity outside the specific statutory standards, 'an independent legal ground for such claim must be shown in every case.'"[68]

The Court applied these principles recently in *Charney v. American Apparel, Inc.*[69] There, the founder and former Chairman and CEO of American Apparel, Inc. sought advancement for legal fees he incurred defending litigation that arose after he ceased holding those positions.[70] Chancellor Bouchard considered whether the director's advancement rights appeared in three instruments—a standstill agreement, the company's charter, and the director's indemnification agreement. When analyzing the indemnification agreement, the Chancellor determined that, "separate from and in addition to the [c]harter . . . , the Company agreed to indemnify and to advance certain of [the director's] expenses under his Indemnification Agreement, which is governed by Delaware law."[71] Thus, the Court recognized that the company validly had exercised its authority under Section 145(f) to grant the director multiple sources of separate and independent

---

[67] FOLK, *supra* note 65 (citing *Mooney v. Willys-Overland Motors, Inc.*, 204 F.2d 888, 899 (3d Cir. 1953)).

[68] FOLK, *supra* note 65, at 102 (citing *Mooney*, 204 F.2d at 896).

[69] 2015 WL 5313769 (Del. Ch. Sept. 11, 2015).

[70] *Id.* at *1.

[71] *Id.* at *9 (citing 8 *Del. C.* § 145(f)).

26

advancement rights. In other words, *Charney* stands for the proposition that the unavailability of advancement under one source of rights does not foreclose the possibility of advancement under another. Sutherland not only failed to address *Charney* in its brief, but also failed to distinguish *Charney* at argument on any meaningful basis.

Sutherland relies exclusively on *Levy v. Hayes Lemmerz International, Inc.*[72] to sustain its argument that construing the Bylaws and the Indemnification Agreement separately is "plainly contradicted by our cases."[73] Sutherland's argument does not turn on the holding of *Levy*. *Levy* interpreted the operative agreements in that case and rejected the company's argument that it had a contractually-mandated thirty-day period to consider a written demand for indemnification, which the former directors breached by filing suit prematurely.[74] Instead, Sutherland focuses on a footnote that states as follows:

> In reaching this conclusion, however, the court rejects the plaintiffs' argument that the Old Hayes bylaws and the indemnification agreements provide two entirely independent sources of indemnification, and that therefore any procedural requirements for indemnification under the agreements are irrelevant to indemnification under the bylaws. Not only does such a

---

[72]    2006 WL 985361, at *7 n.24 (Del. Ch. Apr. 5, 2006).

[73]    Def.'s Post-Trial Answering Br. 12-14 (citing *Levy*, 2006 WL 985361, at *7 n.24).

[74]    *Levy*, 2006 WL 985361, at *6-7.

27

construction of the two documents make nonsense of the indemnification agreements, but it is plainly contradicted by our cases. Most obviously, the Supreme Court was confronted with a similar situation in *Citadel Holding Corp. v. Roven*, 603 A.2d 818 (Del. 1992), where a bylaw provided indemnitees with the full range of indemnification rights available under Delaware law, and the accompanying indemnification agreement contained certain other rights. The court there assumed that the two documents would be read together, and firmly rejected the defendant's position that the indemnification agreement somehow left the advancement provision, at issue in that case, entirely unchanged. The court sees no reason to read the plainly conjunctive documents in this case any differently than the Supreme Court construed them in *Citadel*.[75]

First, the *Levy* Court's rejection of one of the former directors' other arguments as "plainly contradicted by our cases" is dicta and not controlling.

Second, I interpret *Citadel* differently than *Levy* did. In *Citadel*, the Supreme Court determined that, although the directors there were not entitled to mandatory advancement under the DGCL or the company's bylaws, the directors were entitled to mandatory advancement under an indemnification agreement.[76] The Supreme Court's recognition of a contract that provides unique advancement rights not provided elsewhere—like a statute, certificate, or bylaws—supports the proposition that, in the absence of evidence to the contrary, contractual

---

[75]     *Id.* at *7 n.24.

[76]     *Citadel*, 603 A.2d at 823-24.

28

advancement rights are separate and independent from those found in other sources. Accordingly, the Supreme Court's conclusion in *Citadel* that the director's indemnification agreement provided broader rights than the company's bylaws suggests it read those instruments separately.

Third, at argument Sutherland appeared to rely on the rule that contracts entered into by the same parties in one transaction or at the same time should be construed together[77] when it urged the Court to read the Bylaws and

---

[77] *See, e.g.*, *Ashall Homes, Ltd. v. ROK Entm't Gp., Inc.*, 992 A.2d 1239, 1250 n.56 (Del. Ch. 2010) (citing *Crown Books Corp. v. Bookstop Inc.*, 1990 WL 26166, at *1 (Del. Ch. Feb. 28, 1990) ("[I]n construing the legal obligations created by [a] document, it is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters."); 17A C.J.S. *Contracts* § 315 (1999); 11 WILLISTON ON CONTRACTS § 30:26 (4th ed. 1999) ("Apart from the explicit incorporation by reference of one document into another, the principle that all writings which are part of the same transaction are interpreted together also finds application in the situation where incorporation by reference of another document may be inferred from the context in which the documents in question were executed. Thus, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other."); RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.")). The revised edition of Corpus Juris Secondum states, "[i]n the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction are construed together as a single contract." 17A C.J.S. *Contracts* § 401 (2011).

29

Indemnification Agreement together and "come to a natural result."[78] Conspicuously absent from Sutherland's recitation, however, is the rule's qualifying condition, "in the absence of evidence to the contrary."[79] As discussed below, the operative contractual provisions in this case present ample evidence to the contrary. Thus, the rule is not applicable here.

## 2. Interpreting the Bylaws and Indemnification Agreement

Delaware follows an objective theory of contracts, "which requires a court to interpret a particular contractual term to mean 'what a reasonable person in the position of the parties would have thought it meant.'"[80] When a contract is clear and unambiguous, Delaware courts interpret its terms according to their plain meaning.[81] A term in a contract that is reasonably susceptible to more than one interpretation is ambiguous, but "[t]he parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[82] Neither will

---

[78] Oral Arg. Tr. 38 ("We have two parties together, same rights, same day, same subject matter. We should do everything we can to read them together and come to a natural result.").

[79] *See supra* note 77.

[80] *Charney*, 2015 WL 5313769, at *10 (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[81] *Rhone-Poulenc*, 616 A.2d at 1195.

[82] *See Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (citing *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003); *Rhone-Poulenc*, 616 A.2d at 1195).

"extrinsic, parol evidence . . . be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning."[83] Because the relevant provisions here are unambiguous, extrinsic evidence is not considered.

Here, Sutherland's Certificate authorized it to grant Narayanan the advancement rights set forth in its Bylaws and the Indemnification Agreement. Furthermore, the Bylaws and the Indemnification Agreement adopt language substantially similar to the Non-Exclusivity Clause in Section 145 and declare that those instruments are not exclusive of any other source of rights. Moreover, Sutherland's argument that nothing in the Bylaws precludes the parties from negotiating the Indemnification Agreement misses the point. That the Bylaws do not preclude negotiation of the Indemnification Agreement does nothing to counter Narayanan's argument, or the instruments' plain language, that the two exist separately and independently of each other.

Additionally, although the Bylaws and the Indemnification Agreement were both effective as of March 5, 2013, the non-exclusivity provision in each manifests the parties' express intent for each instrument to provide rights and obligations

---

[83]     *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.")).

independent of the other.[84] That Narayanan is a beneficiary of both instruments does not negate the parties' express intent that the Bylaws provide certain rights and obligations to a group of individuals and the Indemnification Agreement provide certain different or additional rights and obligations to a single individual. Had the parties intended the instruments to operate conjunctively, they only needed to replace the non-exclusivity provisions with language to that effect.

In sum, Sutherland has failed to prove by a preponderance of the evidence that the Bylaws and the Indemnification Agreement are conjunctive. Instead, under the circumstances present and for the reasons discussed above, the Court holds that the Bylaws and Indemnification Agreement are separate and independent sources of advancement rights. The Bylaws do not contain or incorporate the Cooperation Provision Sutherland seeks to enforce, and Sutherland fails to prove that the parties intended otherwise. Accordingly, the Court does not reach the parties' alternative arguments regarding cooperation. In addition,

---

[84] Bylaws art. VII § 6 ("The rights conferred on any person by this Article VII shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of stockholders or disinterested directors or otherwise."); Indemnification Agreement § 5(b) ("The indemnification, exoneration or hold harmless rights and the payment of Expense Advances provided by this Agreement shall be in addition to any rights to which [Narayanan] may be entitled under the Company's Certificate of Incorporation, its bylaws, any other agreement, any vote of stockholders or disinterested directors, the DGCL, or otherwise.").

Sutherland concedes that, to the extent the Court rules against Sutherland on cooperation, it is obligated to advance Narayanan's fees and expenses incurred in defending Sutherland's set-off defense and counterclaim in the New York Action and the SDC Criminal Proceedings.[85] This opinion rejects Sutherland's cooperation argument. Therefore, there is no dispute that Narayanan is entitled to advancement generally with respect to the New York Action and the SDC Criminal Proceedings.

### C. Narayanan Served KRV at the Request of Sutherland

Sutherland contends that the Court should deny Narayanan advancement for the KRV Criminal Proceedings. To this end, Sutherland argues, and spent a great deal of time at trial trying to prove, that KRV is not a subsidiary or affiliate of Sutherland and that Narayanan's activities relating to KRV were motivated by his own business interests. Thus, Sutherland reasons, Narayanan's KRV-related activities are outside the scope of his Sutherland-related advancement rights. Both of these arguments fail.

---

[85] *Id.* at 34 ("THE COURT: You do agree, though, . . . to the extent I ruled against you on cooperation, then there wouldn't be a dispute about whether or not Mr. Narayanan is entitled to advancement for the defense of the counterclaims in the New York action and the SDC proceedings? [COUNSEL]: That's correct, Your Honor.").

As an initial matter, that KRV is not a subsidiary or affiliate of Sutherland is irrelevant to whether Narayanan is entitled to advancement of fees and costs related to the KRV Criminal Proceedings. The Bylaws obligate Sutherland to advance Narayanan's legal fees and expenses incurred "by reason of the fact that [he], . . . while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity . . . ."[86] Thus, Narayanan argues correctly that the relevant inquiry under the Bylaws is whether Narayanan, while a director or officer of Sutherland, served as a director, officer, or employee of KRV at Sutherland's request.

At trial, Narayanan testified repeatedly that he worked for and served as a director of KRV because Vellodi, the Chairman, CEO, and controlling stockholder of Sutherland, instructed him to do so.[87] Narayanan also testified credibly that at Sutherland, Vellodi's requests were the equivalent of instructions from the Company. It was not unusual for Narayanan or other Sutherland employees to receive instructions for acting on behalf of Sutherland from Vellodi. For example, Sutherland employees doing KRV work at Vellodi's request and without

---

[86]     *See* Bylaws art. VII § 1; *see also* Indemnification Agreement § 1(b) (requiring the same inquiry).

[87]     Tr. 12, 13, 14-15, 19-20, 23.

34

compensation from KRV included Susan DeCann, Sheela Solomon, Sujeet Oomen, Kiran Verghese Thomas, and Vasudeva Rao.[88]

In the absence of testimony from Vellodi denying that he instructed Narayanan to serve as a director of KRV,[89] Sutherland attempts to prove that Narayanan served as a director of KRV for personal reasons. Specifically, Sutherland highlights Narayanan's history and relationship with DMNC. Ultimately, this evidence shows little more than the fact that such history and relationship exist.[90] Sutherland has failed to demonstrate that, during KRV's

---

[88]   JX 8 (DeCann & Solomon), 61 (Oomen & Thomas), 65 (Thomas), 66 (Rao), 68 (Rao).

[89]   Although Sutherland cites and references Vellodi's deposition transcript in its post-trial brief (Def.'s Post-Trial Answering Br. 9 n.2), the parties' Joint Pre-Trial Stipulation and Order ("PTO") provides that "[d]eposition testimony is admissible to the extent permitted by the Delaware Uniform Rules of Evidence and the Court of Chancery Rules." PTO ¶ VII.1-2. Narayanan objects to Sutherland's reliance on Vellodi's deposition transcript and argues that the transcript is hearsay under D.R.E. 801(c) and is not subject to any exception. Def.'s Post-Trial Reply Br. 2-3 n.1. Sutherland did not attempt to explain Vellodi's last minute absence from the trial, despite the fact that he was on the witness list. Likewise, Sutherland fails to respond to Narayanan's hearsay objection. I agree that the referenced Vellodi deposition is hearsay that is not subject to any exception. As such, I have not considered it in this ruling.

[90]   Sutherland compiles the following evidence in its post-trial Answering Brief: Narayanan founded DMNC in 1994 (Tr. 94; JX 134); Vellodi retained DMNC to form KRV in 2006 (Tr. 120; JX 2); Narayanan and Vellodi used personal addresses when forming KRV (Tr. 116-19; JX 1, 309); KRV's registered address is the same as DMNC's (Tr. 126-28; JX 33); DMNC handled certain duties for KRV (Tr. 169-70); DMNC was compensated for its KRV work (Tr. 123-25, 126-29, 169-70; JX 33, 302); Narayanan remained a partner at DMNC through 2007

35

existence, Narayanan had more than a nominal interest in KRV, received salary or distributions from DMNC during DMNC's relationship with KRV or after his retirement from DMNC, or received material compensation of any kind from any relevant entity other than Sutherland.[91]

Nothing in the record calls into question or rebuts Narayanan's testimony that he served KRV at the request of Vellodi, and the Court finds Narayanan competent and credible on this issue. Accordingly, the Court concludes that Narayanan served KRV at the request of Vellodi. Vellodi, as Sutherland's Chairman, CEO, and controlling stockholder, has both actual and apparent authority to direct employees and bind the Company. And he did just that. Based on the evidence presented at trial, the Court concludes that, under the circumstances, Vellodi's instruction satisfies the Bylaws' requirement that

---

(Tr. 97-98); Narayanan was a signatory on KRV accounts (Tr. 130); there was no formal announcement of Narayanan's retirement from DMNC in 2007 (Tr. 107-08); following his supposed retirement from DMNC, Narayanan continued receiving and sending emails from his DMNC email account (Tr. 111, 115, 116; JX 307, 308); Narayanan continues a personal consulting business despite retiring from DMNC because he was too busy with Sutherland (Tr. 104-05); at one point DMNC relocated across the street from Narayanan's home (Tr. 109, 161); and DMNC's website lists Narayanan as a founder and head of business setup services and advisory services (Tr. 105-06; JX 134). *See* Def.'s Post-Trial Answering Br. 20-22.

[91] Tr. 166 (Narayanan) ("Q. Okay. And apart from your Sutherland salary, were you paid anything for the work that you did on the K.R.V. land transactions? A. No.").

Sutherland request Narayanan serve as a director of another company.

Therefore, the Bylaws entitle Narayanan to recover from Sutherland the fees and expenses he incurred in responding to Sutherland's set-off defense and counterclaim in the New York Action and both India Criminal Proceedings.

### D. Sutherland Must Advance the Fees Narayanan Presented at Trial

"The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees)."[92] In advancement proceedings, the Court of Chancery often makes legal and factual determinations concerning the scope of advancement obligations, but "the function of a § 145(k) advancement case is not to inject this court as a monthly monitor of the precision and integrity of advancement requests."[93] With respect to objections to specific fee requests, this Court has followed *Fasciana v. Electric Data Systems Corporation*, where then-Vice Chancellor Strine observed, "[u]nless some gross problem arises, a balance of fairness and efficiency concerns would seem to counsel deferring fights about details until a final indemnification proceeding . . . ."[94]

---

[92] 8 *Del. C.* § 145(k).

[93] *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 177 (Del. Ch. 2003).

[94] *Id. See also Danenberg v. Fitricks, Inc.*, 58 A.3d 991, 998 (Del. Ch. 2012); *Duthie v. CorSolutions Med., Inc.*, 2008 WL 4173850, at *2 (Del. Ch. Sept. 10, 2008) ("Advancement is not the proper stage for a detailed analytical review of the fees . . . . In the absence of clear abuse, the fees should be advanced.").

As explained above, Sutherland is obligated to advance Narayanan's legal fees in the Underlying Proceedings. Narayanan presented evidence at trial supporting the fees and expenses he requested until then, including an allocation of fees between covered and uncovered claims in the New York Action. Sutherland had every opportunity to submit rebutting evidence, but chose not to. Instead, Sutherland urges the Court not to award Narayanan the fees and expenses he requested at trial *at this stage*. As a matter of judicial efficiency, and because advancement is meant to be a summary proceeding, the Court concludes there is no reason to further delay vindicating Narayanan's right to advancement.[95]

With respect to the India Criminal Proceedings, Narayanan presented evidence at trial on the expenses he incurred and illustrated aspects of India's legal system that differ from ours. In addition, having conceded that Sutherland is not obligated to indemnify or advance Narayanan's legal fees relating to his

[95] Two post-trial opinions support this approach. In *Barrett*, then-Vice Chancellor Strine refused to permit a corporation to delay litigation further with "nit-picking" over the costs directors had incurred to vindicate a clear legal right. 951 A.2d at 747 n.40. Although *Barrett* is distinguishable on factual grounds, it is an example of the Court declining to postpone awarding fees requested at trial. In *Blankenship v. Alpha Appalachia Holdings, Inc.*, Chancellor Bouchard determined a company's obligation to pay advancement and awarded requested expenses to the plaintiff in the same post-trial opinion, even though "[t]he reasonableness of the invoices [the plaintiff] submitted for payment was not the subject of any inquiry at trial . . . ." 2015 WL 3408255, at *27 (Del. Ch. May 28, 2015). Citing *Fasciana*, the Chancellor observed that the defendants had no substantive objection that the withheld fees were unreasonable and raised no "gross problem" or legitimate reason requiring a "playground monitor" at that stage. *Id.* at 28.

38

affirmative claims in the New York Action, Narayanan presented evidence on the process his New York counsel utilized to segregate unrecoverable fees from those to which Narayanan legally is entitled.

Narayanan requests Sutherland advance 3,090,000 rupees—275,000 for fees and expenses incurred in the SDC Criminal Proceeding and 2,815,000 for fees and expenses incurred in the KRV Criminal Proceeding.[96] Acknowledging that he had hired several lawyers, Narayanan explained at trial that India has a solicitors and barristers system similar to England and that it is not unusual in India to hire as many lawyers as he did to handle proceedings in multiple courts.[97] Sutherland did not present any evidence on this issue. Nothing in the record calls into question or rebuts Narayanan's testimony with respect to these fee requests, and the Court finds Narayanan competent and credible on this issue. Thus, Sutherland shall advance the 3,090,000 rupees Narayanan requested at trial.

Narayanan requests $115,688 for fees and expenses incurred in the New York Action. John Cuti, one of Narayanan's lawyers in the New York Action, testified at trial that the fees and expenses incurred in defending that action through

---

[96] Pl.'s Post-Trial Opening Br. 50; *see also* JX 116, 200, 202-05.

[97] Tr. 80.

November 2015 are documented in a series of invoices.[98] Because these invoices include fees and expenses incurred in prosecuting affirmative claims for which indemnification and advancement are not recoverable, Cuti utilized the following process for segregating recoverable fees and expenses. First, Cuti reviewed the invoices and allocated the individual entries based on whether the time was spent either on the uncovered affirmative claims or the covered set-off defense and counterclaim.[99] Then, Cuti created two consolidated, color-coded itemizations of the time entry-by-time entry allocations for both (1) the set-off defense and counterclaim[100] and (2) the efforts to force Sutherland to honor its indemnification and advancement obligations, including New York counsel's efforts related to this action.[101] Lastly, Cuti compiled the totals from those two itemizations into a chart summarizing the breakdown, which reflects that Narayanan's New York counsel incurred $115,688 in fees in responding to Sutherland's set-off defense and

---

[98] Tr. 225-28 (Cuti); s*ee also* JX 93, 96, 101, 106, 110, 114. In December 2015, Cuti also began separating his fees and expenses arising from this Delaware Action from those related to the New York Action. *See* JX 124 (New York Action), JX 125 (Delaware Action).

[99] Tr. 230. This included reviewing "e-mail correspondence and other documents to help refresh [Cuti's] recollection about how much time was spent on various matters." Tr. 229-30.

[100] JX 118.

[101] JX 119. As Cuti explained at trial, individual line items on the color-coded itemizations found in JX 118 and 119 correspond and can be traced back to the allocated time entries found in JX 211, 212, 113, and 124. Tr. 229-34.

40

counterclaim.[102]  Again, Sutherland neither presented evidence on this issue nor submitted any substantive objection to the allocation procedure Cuti employed or the fees Narayanan requested.  Thus, Sutherland shall advance the $115,688 Narayanan requested at trial.

Narayanan also seeks the reasonable fees and expenses he incurred in connection with this Delaware Action.  Delaware law and the Bylaws mandate the payment of fees-on-fees here.[103]  In particular, the Bylaws provide that, if Narayanan is "successful in whole or in part" on "a claim for indemnification or advancement of expenses," he "shall be entitled to be paid the expense of prosecuting [his] claim."[104]  Narayanan has been "successful in whole" in obtaining advancement of the fees and expenses he requested at trial.  Accordingly, the Bylaws entitle Narayanan to be paid the expense of prosecuting this Delaware Action.  Through February 10, 2016, Narayanan incurred legal fees and expenses related to this action in the amount of $239,500.04 from his Delaware counsel and

---

[102]    Tr. 234-35; JX 117.

[103]    8 *Del. C.* § 145; *see also Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002) ("We hold that indemnification for expenses incurred in successfully prosecuting an indemnification suit are permissible under § 145(a), and therefore 'authorized by law.'"); *Barrett*, 951 A.2d at 746 (noting "Supreme Court jurisprudence mandating 'fees on fees' in advancement actions" and awarding directors legal fees and costs associated with prosecuting action).  Bylaws art. VII, § 3.

[104]    Bylaws art. VII § 3.

$60,348.00 from his out-of-state counsel.[105]   As before, Sutherland makes no substantive objection to Narayanan's request.   Sutherland shall advance the $299,848.04 that Narayanan requested at trial.

Next, "[a] party seeking advancement is entitled to interest from the date on which the party 'specified the amount of reimbursement demanded and produced his written promise to pay.'"[106]   Narayanan's request for pre-judgment interest is unopposed.  In Delaware, pre-judgment interest accrues at the legal rate set forth in 6 *Del. C.* § 2301(a) and is compounded quarterly.[107]   Narayanan submitted the Initial Notice demanding advancement and providing an undertaking to Sutherland on October 19, 2015 and the Supplemental Notice adding a demand for advancement with respect to this action on December 14, 2015.[108]   Under the Bylaws, Sutherland was required to pay these demands in full within thirty days of receiving them.[109]   Thus, Narayanan is entitled to pre-judgment interest, accruing

---

[105]   *See* Aff. of John R. Cuti in Connection with Count II of the Verified Compl.; Aff. of Garrett B. Moritz in Connection with Count II of the Verified Compl.; *see also* JX 81, 109, 114, 122, 124, 125, 135.

[106]   *Underbrink v. Warrior Energy Servs., Corp.*, 2008 WL 2262316, at *19 (Del. Ch. May 30, 2008); *see also O'Brien v. IAC/Interactive Corp.*, 2010 WL 3385798, at *17 (Del. Ch. Aug. 27, 2010) (awarding pre-judgment interest), *aff'd*, 26 A.3d 174 (Del. 2011).

[107]   *Underbrink*, 2008 WL 2262316, at *19.

[108]   JX 109, 122.

[109]   Bylaws art. VII § 3.

at the statutory rate and compounded quarterly, beginning thirty days after Sutherland received each of Narayanan's demands on the amounts requested therein.[110]

Finally, Narayanan requests that the Court enter an order providing for a procedure for submission of further requests for advancement and the prompt resolution of any disputes that arise regarding such requests.[111] The Court concludes that an order imposing the framework detailed by this Court in *Fitracks* is appropriate for governing fee requests and objections going forward.[112]

## III. CONCLUSION

For the foregoing reasons, the Court concludes that the Bylaws entitle Narayanan to recover from Sutherland 275,000 rupees for fees and expenses incurred in the SDC Criminal Proceedings; 2,815,000 rupees for fees and expenses incurred in the KRV Criminal Proceedings; $115,688.00 for fees and expenses incurred through December 31, 2015 in connection with defending Sutherland's second affirmative defense and counterclaim in the New York Action; and $299,848.04 for fees and expenses incurred in this Delaware Action through the

---

[110] That is, the interest due on each demand shall be calculated separately using the relevant dates and amounts requested.

[111] Pl.'s Post-Trial Reply Br. 50.

[112] *Fitracks*, 58 A.3d at 1003-04.

February 10, 2016 trial. Sutherland shall pay these fees and expenses, together with pre-judgment interest, accruing at the statutory rate and compounded quarterly, beginning thirty days after Sutherland received each of Narayanan's demands on the amounts requested therein, no later than ten days after the filing of this opinion.

The parties shall submit a stipulated form of order within ten days of this opinion imposing the framework detailed by this Court in *Danenberg v. Fitracks, Inc.*,[113] which order shall govern the submission of further requests for advancement and the prompt resolution of any disputes that arise regarding such requests.

**IT IS SO ORDERED.**

---

[113]     58 A.3d 991, 1003-04 (Del. Ch. 2012).